862 P.2d 870

SAMARITAN FOUNDATION, an Arizona corporation; Samaritan Health Services, dba Good Samaritan Regional Medical Center, an Arizona corporation; Cathey Milam Chester and Elaine Fraiz, Petitioners,

Lawrence J. Koep, M.D., P.C., an Arizona corporation and Lawrence J. Koep, M.D., Defendants–Petitioners,

v.

The Honorable Stanley Z. GOODFARB, a judge thereof, Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,

and

Arista Mia DAWSON, a minor, By and Through her next friend and natural father, Robert E. DAWSON; Robert E. Dawson and Dale M. Dawson, husband and wife, Real Parties in Interest.

PHOENIX CHILDREN'S HOSPITAL, INC., an Arizona corporation, Petitioner,

v.

The Honorable Stanley Z. GOODFARB, a judge thereof, Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,

and

Arista Mia DAWSON, a minor, By and Through her next friend and natural father, Robert E. DAWSON; Robert E. Dawson and Dale M. Dawson, husband and wife, Real Parties in Interest.

No. CV–92–0282–PR.

Supreme Court of Arizona, En Banc.

Nov. 16, 1993.

Reconsideration Denied Jan. 11, 1994.

Jones, Skelton & Hochuli by Bruce D. Crawford, Lori A. Shipley and David C. Lewis, Phoenix, for Samaritan Foundation.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Paul J. Giancola and Harding B. Cure, Phoenix, for Lawrence J. Koep, M.D.

Weyl, Guyer, MacBan & Olson by Thomas G. Bakker, Jolane D. Veeder and Cheralee W. Fisk, Phoenix, for Phoenix Children's Hosp., Inc.

Leonard & Clancy by Kenneth P. Clancy and James J. Leonard, Jr., Phoenix, for Arista Mia Dawson, Robert E. Dawson and Dale M. Dawson.

Bess & Dysart by Brad K. Keogh and Timothy R. Hyland, Phoenix, for Nat. Ass'n of Legal Assistants, Inc., Legal Assistants of Metropolitan Phoenix, amici curiae.

Lewis and Roca by Beth J. Schermer, Janet A. Napolitano and Alexandra M. Shafer, Phoenix, for America West Airlines, Arizona Hosp. Ass'n, Arizona Public Service Co., Bank of America Arizona, Calmat of Arizona, The Dial Corp., Phelps Dodge Corp., First Interstate Bank of Arizona, Salt River Project, Product Liability Advisory Council, Inc., Tucson Elec. Power Co. and Valley Nat. Bank, amici curiae.

Ulrich Thompson Kessler by Paul G. Ulrich and Donn G. Kessler, Phoenix, for Truck Ins. Exchange, amicus curiae.

Gallagher & Kennedy by Kevin E. O'Malley, Elliot Talenfeld and David C. Donohue, Phoenix, for Arizona Ass'n of Defense Counsel, amicus curiae.

Sacks, Tierney & Kasen by Lawrence J. Rosenfeld, Snell & Wilmer by Barry D. Halpern, Thea Foglietta Silverstein and Broening Oberg & Woods by Cynthia van R. Cheney, Phoenix, for Arizona Ass'n of Health Care Lawyers, Arizona Medical Ass'n, Arizona Soc. for Healthcare Risk Management, amici curiae.

Fennemore Craig by Timothy Berg and Janice K. Procter–Murphy, Phoenix, for Arizona Chamber of Commerce, Arizona Ass'n of Industries, McDonnell Douglas Helicopter Co., amici curiae.

## OPINION

MARTONE, Justice.

This case requires us to define the nature and scope of the corporate attorney-client privilege. We necessarily examine the nature of the communication and the communicator. In the process, we reject the control group test as being both overinclusive and underinclusive. Our conclusions focus more on the nature of the communication than on the status of the communicator. The relevant inquiry is: to which corporate employee *communications* does the privilege apply, not to which corporate *employees* does the privilege apply. We hold that all communications initiated by the employee and made in confidence to counsel, in which the communicating employee is directly seeking legal advice, are privileged. In contrast, where an investigation is initiated by the corporation, factual communications from corporate em-

ployees to corporate counsel are within the corporation's privilege only if they concern the employee's own conduct within the scope of his or her employment and are made to assist counsel in assessing or responding to the legal consequences of that conduct for the corporate client.

## I. *BACKGROUND*

A child's heart stopped during surgery at the Phoenix Children's Hospital in the Good Samaritan Regional Medical Center in 1988. A Good Samaritan lawyer investigated the incident and directed a nurse paralegal to interview three nurses and a scrub technician who were present during the surgery. Each of these Samaritan employees signed a form agreeing to accept legal representation from Samaritan's legal department. The paralegal summarized the interviews in memoranda that she then submitted to corporate counsel.

The child and her parents brought an action against Phoenix Children's Hospital and the physicians who participated in the surgery, alleging that the cardiac arrest and resulting impairment were caused by the defendants' medical negligence. When deposed two years later, the four Samaritan employees were unable to remember what happened in the operating room. Having learned of the existence of the interview summaries through discovery, plaintiffs sought their production. Samaritan, a non-party, and Phoenix Children's Hospital resisted, arguing that the interview summaries were protected by the attorney-client privilege and the work product doctrine. The trial court ordered production of the summaries for *in camera* review. It said it would strike out attorney work product and then release to the plaintiffs those portions of the summaries that would otherwise constitute witness statements. In short, the trial judge treated the documents as though they were not within the corporate attorney-client privilege, but were within the work product doctrine.

Samaritan and Children's Hospital filed petitions for special action in the court of appeals arguing, among other things, that under the rule of *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the employee communications summarized in the memoranda were within Samaritan's attorney-client privilege. The court of appeals accepted jurisdiction but denied relief. It rejected *Upjohn*, adopted the control group test, and created a qualified attorney-client privilege for non-control group employees. It held that only communications of control group employees were within the absolute protection of the corporation's attorney-client privilege. The court concluded that the plaintiffs had made a showing of the sort of need that is required to reach work product, and because the nurses and scrub technician were not control group employees, rejected Samaritan's claim of attorney-client privilege. *Samaritan Foundation v. Superior Court*, 173 Ariz. 426, 844 P.2d 593 (App.1992). We granted Samaritan's and Phoenix Children's Hospital's petitions for review and now affirm the trial court but vacate that part of the court of appeals' opinion that addresses the corporate attorney-client privilege.

## II. *ANALYSIS*

We resolve preliminary issues first. To the extent that each of the petitions for review raises issues other than the corporate attorney-client privilege, we resolve them against the petitioners. This means that we agree with the resolution by the court of appeals of issues relating to the work product doctrine. And, because the documents have been produced by Samaritan, Phoenix Children's Hospital's claim of immunity based upon non-possession is moot. The surviving issues in each of the petitions for review relate to the rejection by the court of appeals of the *Upjohn* case, and its creation of a qualified attorney-client privilege for non-control group employees. It is to these fundamental issues that we now turn.

In *Upjohn*, the Court rejected the control group test under federal common law. The control group test focuses on the nature of the communicator rather than the communication. Under it, persons in a po-

sition to control or take a substantial part in a decision about action a corporation may take upon advice of counsel have the capacity to make communications to corporate counsel that are within the corporation's attorney-client privilege. *See City of Philadelphia v. Westinghouse Elec. Corp.*, 210 F.Supp. 483, 485 (E.D.Pa.), *petition for writ of mandamus or prohibition denied sub nom. General Elec. Co. v. Kirkpatrick*, 312 F.2d 742 (3d Cir.1962), *cert. denied*, 372 U.S. 943, 83 S.Ct. 937, 9 L.Ed.2d 969 (1963). Other employees do not. Eschewing *Upjohn*, our court of appeals adopted the control group test, and then created a lesser, qualified privilege for non-control group employees. We think an approach that focuses solely upon the status of the communicator fails to adequately meet the objectives sought to be served by the attorney-client privilege. We take a functional approach. The focus is on the nature of the communication and not the communicator. This does not, however, mean that Samaritan prevails, for as we shall see, under our functional approach, the privilege does not apply to corporate-initiated factual communications from those who, but for their status as employees, are mere witnesses.

### A. *First Principles*

■ Because our approach focuses on the substance of the attorney-client privilege, we state some first principles. Under the attorney-client privilege, unless a client consents, a lawyer may not be required to disclose communications made by the client to the lawyer or advice given to the client in the course of professional employment. A.R.S. § 12–2234 (1982) (civil actions). *See also* A.R.S. § 13–4062(2) (1989) (criminal proceedings). The privilege is intended to encourage the client in need of legal advice to tell the lawyer the truth. Unless the lawyer knows the truth, he or she cannot be of much assistance to the client. Thus, the privilege is central to the delivery of legal services in this country. *See State v. Holsinger*, 124 Ariz. 18, 22, 601 P.2d 1054, 1058 (1979) ("The reason for the privilege is not to protect the client, but to encourage free exchange of information between the attorney and the client and to promote the administration of justice.")

The privilege is not without its costs. It can interfere with the search for truth when, for example, the client cannot remember that which it told its lawyer. One would like to go to the lawyer and ask. *See generally* 1 *McCormick on Evidence* § 72, at 269 (John W. Strong ed., 4th ed. 1992); 8 John H. Wigmore, *Evidence* § 2291, at 554 (McNaughten rev. ed. 1961).

■ Of course, there must be an attorney-client relationship before the privilege exists. *Alexander v. Superior Court*, 141 Ariz. 157, 162, 685 P.2d 1309, 1314 (1984) (party divulges secrets to lawyer to secure advice). And, to be privileged, the communication must be made to or by the lawyer for the purpose of securing or giving legal advice, must be made in confidence, and must be treated as confidential. *Wigmore, supra,* § 2292, at 554. *See United States v. Kovel*, 296 F.2d 918, 922 (2d Cir.1961) ("What is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer.*") (Friendly, J.). Thus, not all communications to one's lawyer are privileged.

■ Plaintiffs have argued here that under Rule 26.1, Ariz.R.Civ.P., the new disclosure rule, factual communications are no longer privileged. This is not the case. We must distinguish between *facts*, which the client must disclose with or without a lawyer, and the *communication* of those facts by a client to a lawyer on a confidential basis when seeking legal advice. The privilege does protect disclosure of the communication but does not protect disclosure of the underlying facts by those who communicate with a lawyer. That is to say, a client who has a duty to disclose facts in discovery or otherwise is not relieved of that duty simply because those same facts have been communicated to a lawyer. *Upjohn* notes the distinction well. 449 U.S. at 395–96, 101 S.Ct. at 685–86 ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who

communicated with the attorney."). Clients and their lawyers have and continue to have an obligation to respond truthfully to discovery requests seeking facts within their knowledge.[1]

### B. *The Problem of the Corporate Client*

[7] When a client is a person, things are relatively simple. That person's communications are client communications. But when the client is a corporation, things become complex.[2] The corporation is a fictional entity which has independent status under the law. But it can only act through its agents. Thus, the client, the corporate entity, and its agents, who are the only ones who can communicate, are separated. Client communications cannot be identified simply as those of particular agents, as in the control group test, because although an agent can make statements on behalf of the corporate client, he or she can also make statements as an individual. But how do we determine which communications made by the corporation's agents are those of the corporate client and not merely those of the individual speaker?

We are not the first to acknowledge the complexity of the issue and to seek some unifying answer. Two competing theories have emerged. Illinois adopted the control group test in *Consolidation Coal Co. v. Bucyrus—Erie Co.*, 89 Ill.2d 103, 59 Ill. Dec. 666, 432 N.E.2d 250 (1982). If otherwise privileged, it protects communications by decisionmakers or those who substantially influence corporate decisions. Our court of appeals relied on *Consolidation Coal* in adopting the control group test. But it, too, acknowledged that the control group test is underinclusive and adopted a new theory: a qualified attorney-client privilege for non-control group employees.

In effect, it relegated non-control group employees to the kind of limited protection afforded by the work product doctrine. But this affords to some *client* communications only the lesser protection afforded *witnesses. See Hickman v. Taylor*, 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947). Hence, it is still underinclusive.

A second major test, the subject matter test, takes a broader approach to deal with the underinclusiveness of the control group test. As articulated in *Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487 (7th Cir.1970), *aff'd by an equally divided court*, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971), it focuses on the nature of the communication—not the status of the communicator. Under it, an employee, within or without the control group, can make a privileged communication to corporate counsel if it is made at the direction of his superiors and if the subject matter upon which advice is sought is the employee's performance of his duties.[3] The vice of the subject matter test as it has evolved is its overinclusiveness. It will capture statements by employees who, because of their duties, are witnesses to the conduct of others.

■ How do we avoid the underinclusiveness of the control group test, and at the same time avoid the overinclusiveness of a broad interpretation of the subject matter test?

Recall that a similar problem exists in other areas of the law involving corporations. For example, under the doctrine of respondeat superior, the conduct of an agent is imputed to the corporation when that conduct is committed within the scope of the agent's employment. *See Echols v. Beauty Built Homes, Inc.*, 132 Ariz. 498,

---

1. If a client refuses to disclose facts communicated to the lawyer in confidence, at a minimum the lawyer would have to withdraw. See ER 1.16(a)(1) and ER 3.4(a).

2. *See Radiant Burners, Inc. v. American Gas Ass'n.*, 207 F.Supp. 771 (N.D.Ill.1962) (corporation cannot be a client for purpose of attorney-client privilege), rev'd, 320 F.2d 314 (7th Cir. 1963) (reversing district court and holding that attorney-client privilege is not limited to natural

persons); *American Cyanamid Co. v. Hercules Powder Co.*, 211 F.Supp. 85 (D.Del.1962) (commenting on the complexity of the attorney-corporate client privilege). *See generally* David Simon, *The Attorney–Client Privilege as Applied to Corporations*, 65 Yale L.J. 953 (1956).

3. *See* Restatement (Third) of the Law Governing Lawyers § 123 cmt. d (Tentative Draft No. 2, 1989) (draft adopts the subject matter test).

502, 647 P.2d 629, 633 (1982). Likewise, the knowledge of a corporate agent is imputed to the corporation if it is acquired by the agent within the scope of his or her employment and relates to a matter within his or her authority. *Fridena v. Evans,* 127 Ariz. 516, 519, 622 P.2d 463, 466 (1980). So, too, statements made by an employee or agent concerning a matter within the scope of the agency or employment, made during the existence of the relationship, are directly admissible against the corporation as the admission of a party-opponent under Rule 801(d)(2), Ariz.R.Evid.

Thus, we see in other areas that what an employee does, knows, or says is sometimes imputed to the corporation without reference to where in the chain of command the employee belongs. Instead, behavior, knowledge, and statements are imputed to the corporation as a function of the nature of the behavior, knowledge, and statements, and the context surrounding them, and not upon the identity of the actor or speaker. This suggests that a functional approach ought similarly to apply to the problem posed by the corporate entity within the context of the attorney-client privilege. The defining characteristic of this functional approach is the nature, purpose, and context within which the communication occurs.

We agree with the Supreme Court of California that "the corporation not be given greater privileges than are enjoyed by a natural person" and that we should "apply to corporations the same reasoning as has been applied in regard to natural persons in reference to [the attorney-client] privilege." *D.I. Chadbourne, Inc. v. Superior Court,* 60 Cal.2d 723, 36 Cal.Rptr. 468, 477, 388 P.2d 700, 709 (1964).

### C.  *The Privilege for Communications in the Course of Seeking Legal Advice*

█  Client communications tend to fall into two categories: those initiated by the employee seeking legal advice and those made in response to an overture initiated by someone else in the corporation. It is universally accepted that communications directly initiated by an employee to corporate counsel seeking legal advice on behalf of the corporation are privileged. We agree that these kinds of communications by a corporate employee, regardless of position within the corporate hierarchy, are privileged. When a corporate employee or agent communicates with corporate counsel to secure or evaluate legal advice for the corporation, that agent or employee is, by definition, acting on behalf of the corporation and not in an individual capacity. These kinds of communications are at the heart of the attorney-client relationship. And it is plain that these communications can occur at any level of the chain of command. At one end of the spectrum is the chief executive officer seeking advice from corporate counsel on the antitrust implications of corporate behavior, even if the behavior is not his. At the other end, the driver of a corporate truck may run into corporate counsel's office seeking advice about an accident. In either case, the privilege applies because the employee is seeking legal advice concerning that employee's duties (the chief executive officer) or behavior (the driver) on behalf of the corporation. As to these kinds of legal communications, including the communication of facts, we hold that all communications made in confidence to counsel in which the communicating employee is directly seeking legal advice are privileged.

### D.  *The Privilege for Factual Communications Made by Employees in Response to Overtures by Someone Else in the Corporation*

The real debate concerning the proper scope of the corporation's attorney-client privilege is its applicability to factual communications made in response to an overture initiated by someone else in the corporation. Unless there is some self-limiting feature, the breadth of corporate activity could transform what would be witness communications in any other context into client communications. In such an event, the costs of the privilege are potentially much greater when asserted by a corporation over the statements of its agents than

when asserted by an individual over his or her own statements. But there is no countervailing benefit. The rationale of the privilege is that by assuring the individual client that his or her communications cannot be disclosed without consent, it encourages the client to be candid. But this only works if the communicator controls the privilege. In the corporate context, the privilege belongs to the corporation and not the person making the communication.[4]

If an employee has exposed the corporation to liability, it seems less problematic to legitimize the corporation's control over the privileged nature of the employee's communications. After all, it is the action of this employee that is being imputed to the corporation. It is this employee's statements that are directly admissible against the corporation under Rule 801(d)(2)(D), Ariz. R.Evid. This employee's statements are also the most important in enabling corporate counsel to assess the corporation's legal exposure and formulate a legal response. And none of this has anything at all to do with whether the employee is a member of a control group. We must, therefore, always look at the relationship between the communicator and the incident giving rise to the legal matter, the nature of the communication and its context.

If the employee is not the one whose conduct gives rise to potential corporate liability, then it is fair to characterize the employee as a "witness" rather than as a client. The vice of the control group test is that it includes in the privilege the factual statements of control group employees even if they were mere witnesses to the events in question, while at the same time it fails to take into account the need to promote institutional candor with respect to factual communications of non-control group employees whose conduct has exposed the corporation to possible adverse legal consequences. The test is both over-inclusive and underinclusive. We, therefore, reject the control group test as unsatisfactory on its own terms.

Over and above its inadequacy as a theory to deal with the complex problems of the attorney-client privilege in the corporate context, there are other reasons to avoid the control group test. Our world is growing smaller. Corporate activity is increasingly global and almost always national. Although its outer limits are unclear, *Upjohn* at a minimum rejects the control group test as a rule of federal common law. We should minimize disparities between federal and state law when it comes to privilege. When clients seek legal advice, they do not expect that the privilege will exist for purposes of some claims but not others. Much litigation today consists of both state and federal claims, sometimes in the same action. Federal and state claims can be asserted simultaneously in federal and state forums. For example, there are frequently pendent state claims attached to federal question claims in the United States district courts. Similarly, there are frequently federal claims, such as actions under 42 U.S.C. § 1983, joined with state law claims in state court. The adoption of the control group test would mean that some communications would be admissible as to one claim but not the other. *See* Julie E. Rice, Note, *The Attorney–Client Privilege in the Corporate Context: The Intersection of Federal and Illinois Law*, 1984 U.Ill.L.Rev. 175, 187. It is hard to imagine a judge instructing a jury to consider a communication received in evidence as to one claim, and because of privilege, not the other.

But what of *Upjohn?* After rejecting the control group test as too narrow a definition of the attorney-client privilege, the Court went on to hold that the communications at issue there were privileged. 449 U.S. at 395, 101 S.Ct. at 685. It declined, however, to "lay down a broad rule or series of rules to govern all conceivable

---

**4.** Indeed, one commentator has suggested a theory of corporate attorney-client privilege that applies only to the communications of persons "who have the authority to control the subsequent use and distribution of the communications." Stephen A. Saltzburg, *Corporate and Re-* *lated Attorney–Client Privilege Claims: A Suggested Approach*, 12 Hofstra L.Rev. 279, 306 (1984). By vesting so much authority in the communicator, this approach, too, has the potential to be widely over and underinclusive.

future questions in this area." *Id.* at 386, 101 S.Ct. at 681. Nevertheless, Samaritan argues that *Upjohn* adopted a broad version of the subject matter test, which includes within the privilege communications by all employees who speak at the direction of their corporate superiors to the corporation's lawyer regarding matters within the scope of their corporate duties in order to facilitate the formulation of legal advice for the corporation. *See Harper & Row,* 423 F.2d at 491–92; *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 609 (8th Cir.1977); Jack B. Weinstein and Margaret A. Berger, 2 *Weinstein's Evidence,* ¶ 503(b)[04], at 503–68 (1992).

There is language in *Upjohn* to support Samaritan's argument. The Court noted that "[t]he communications concerned matters within the scope of the employees' corporate duties, and the employees themselves were sufficiently aware that they were being questioned in order that the corporation could obtain legal advice." *Upjohn,* 449 U.S. at 394, 101 S.Ct. at 685. From this, Samaritan argues that the privilege protects the employee communications at issue here because the nurses and scrub technician were carrying out their corporate duties while present in the operating room. Plaintiffs argue that the employees were merely witnesses to what happened.

■ We are of the view that a broad interpretation of the subject matter test, requiring only that the communication concerns factual information gained in the course of performing the speaker's corporate duties, is inadequate. The employee's connection to the liability-causing event is too attenuated to fit the classical model of what it means to be a client. Such a broad standard would only exclude from the privilege factual communications of employees whose knowledge was truly fortuitous. For example, under a broad formulation, the statement of a corporate officer who glances out the window and happens to see the corporation's truck negligently collide with another vehicle would not be privileged. However, the statement of a corporate employee who is present in the truck

by virtue of his or her corporate duties but was not driving the truck or otherwise involved in causing the accident would be privileged. This is the construction urged by Samaritan and the various amici. We believe, however, that the latter person also should be considered a mere witness for purposes of the privilege. Although the employee's presence, and hence the employee's knowledge, is a function of his or her corporate employment, the employee bears no other connection to the incident. The employee did not cause it. His actions did not subject the corporation to possible liability. When this employee speaks, it is not about his or her own actions, but the actions of someone else—the driver.

We, therefore, reject a broad version of the subject matter test. We believe it is subject to a narrower interpretation, one more consistent with the concerns we have expressed. Many of the most often cited authorities suggest that we require that the employee's communication relate to the employee's own activities that are within the scope of his or her employment and are being attributed to the corporation. *See Harper & Row,* 423 F.2d at 491–92 (communication privileged "where the subject matter upon which the attorney's advice is sought by the corporation and dealt within the communication is the performance by the employee of the duties of his employment"); *Diversified Industries,* 572 F.2d at 608 (communications at issue were made by employees whose conduct was the subject of the corporate attorney's legal advice); Weinstein & Berger, *supra,* ¶ 503(b)[04], at 503–68 (subject matter of the communication must be "the performance by the employee of the duties of his employment").

We believe that a functional approach that focuses on the relationship between the communicator and the need for legal services is truer to the objective sought to be achieved by the attorney-client privilege. The California Supreme Court adopted this approach 30 years ago. *D.I. Chadbourne,*

*Inc.,* 36 Cal.Rptr. at 477, 388 P.2d at 709.[5] We also believe that such an approach is closer to the holding of *Upjohn,* if not some of its language. Recall that in *Upjohn* the communications were from foreign general and area managers regarding questionable payments to foreign governments. It is unclear whether these managers participated in the matters that were the subject of the investigation. The lower court had rejected the claim of privilege because these persons were not within the control group. The Supreme Court held otherwise, reversed, and remanded for further proceedings. Chief Justice Burger wrote a concurring opinion eschewing the majority's extremely fact-specific approach and distilling from the case a narrowing of the subject matter test to that conduct of an employee which could bind the corporation. 449 U.S. at 403, 101 S.Ct. at 689 (Burger, C.J., concurring.)

Instead of applying a narrower version of the subject matter test, the court of appeals below adopted a broad version for communications of non-control group employees, but then, because of the concerns we have already expressed, made it qualified. A qualified privilege, however, is an uncertain privilege, and an uncertain privilege is tantamount to no privilege at all. Unless the privilege is known to exist at the time the communication is made, it will not promote candor. Thus, an uncertain privilege has the potential of achieving the worst possible result: it could harm the truth seeking process without a corresponding increase in candor. Note, *Attorney–Client Privilege for Corporate Clients: The Control Group Test,* 84 Harv.L.Rev. 424, 434 (1970). Balancing competing interests is appropriate when formulating the extent of the privilege, but balancing on a case by case basis defeats the purpose of the privilege. We conclude that a narrow but absolute privilege is preferable to a broad but amorphous one.

We are not persuaded by the amici that, without a broader privilege, corporations will forego prompt post-accident investigations. By not extending the privilege, we place the corporate client on a par with the individual client asserting a privilege as to his or her own communications. This is the purpose of our functional approach. It is, in any event, in the interest of the corporation to be informed, and in most cases it will conclude that ignorance is too high a price to pay to avoid taking witness statements that are potentially discoverable. After all, even those statements have the more qualified protection afforded by the work product doctrine. We are not persuaded that a corporation will intentionally put itself in the position of being the last to know the facts when it is facing potential liability for the acts of its agents. Finally, under the privilege as we have defined it, the kind of communications most likely to be characterized as client statements will be privileged.

Amici also argue that, without a broader privilege, corporations will cease policing their own activities to ensure that they comply with the law. We do not agree. Corporations comply with the law because they wish to avoid liability.

■ The Rules of Professional Conduct are consistent with a functional approach. Amici have argued that a comment to ER 1.13 ("[w]hen one of the constituents of an organizational client communicates with the organization's lawyer in that person's organizational capacity, the communication is protected by ER 1.6") supports their view that all employee communications are within the attorney-client privilege. But ER 1.6 is much broader than the attorney-client privilege. It protects all information relating to the representation against even non-compulsory disclosure. Rules of Professional Conduct ER 1.6 cmt. A communication is not privileged simply because a lawyer has a duty to keep it confidential. A lawyer must reveal non-privileged information when required to do so.

Closer to the point is ER 4.2, which prohibits a lawyer who represents a party

---

**5.** We need not, and therefore do not, reach all the "basic principles" stated at 36 Cal.Rptr. at 477–78, 388 P.2d at 709–10.

adverse to an organization represented by another lawyer from talking to persons in the organization "whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization." ER 4.2 cmt. That such a person is identified with the corporate party suggests that an uninvolved employee (as we have defined it) is not.

■ We therefore hold that, where someone other than the employee initiates the communication, a factual communication by a corporate employee to corporate counsel is within the corporation's privilege if it concerns the employee's own conduct within the scope of his or her employment and is made to assist the lawyer in assessing or responding to the legal consequences of that conduct for the corporate client. This excludes from the privilege communications from those who, but for their status as officers, agents or employees, are witnesses.

We believe that this is the appropriate place to draw the line. It has all the advantages of a narrow reading of *Upjohn* (rough comparability with federal common law) without the attendant disadvantages of a broad reading of *Upjohn* (fails to limit the scope of the privilege to its purpose). Thus, litigants may not be faced with drastically different privileges in a single proceeding. Although we cannot control how federal courts will interpret *Upjohn*, should there be differences, they will not be as great as they would be if we adopted the control group test or the control group/qualified subject matter test adopted by the court of appeals.

Our definition of the privilege dovetails with doctrines adopted in response to the problems posed by the corporate entity in other areas of the law. For example, factual communications of the employee concerning the acts of that employee that can be imputed to the corporation under the doctrine of respondeat superior will be privileged. These generally are the statements that would in other contexts be admissible against the corporation as admissions by a party-opponent under Rule 802(d)(2)(D), Ariz.R.Evid. Though we do not suggest that perfect symmetry will always prevail among the various doctrines, a unified approach to the problem posed by the corporate entity in disparate areas of the law promotes clarity, consistency, and reason.

## III. *RESOLUTION*

■ Applying our test to the facts of this case, we conclude that the statements made by the nurses and scrub technician to Samaritan's counsel are not within Samaritan's attorney-client privilege. These employees were not seeking legal advice in confidence. The initial overture was made by others in the corporation. Although the employees were present during the operation, their actions did not subject Samaritan to potential liability. Their statements primarily concerned the events going on around them and the actions of the physicians whose alleged negligence caused the injuries. These statements were not gathered to assist Samaritan in assessing or responding to the legal consequences of the speaker's conduct, but to the consequences for the corporation of the physician's conduct. Thus, these Samaritan employees were witnesses to the event, and their statements are not within the attorney-client privilege.

The effort by corporate counsel to sign these employees as independent clients is itself an acknowledgement that the corporation was not satisfied that the employee statements were within the corporation's privilege. The forms presented to the employees state that they may be called as a "witness" in connection with the incident under investigation, yet also imply, in oblique terms, that the employee may be in need of legal representation and that Samaritan will supply them with such representation. It tells the employees that those who want Samaritan to represent them should not discuss the case with anyone other than Samaritan's lawyers, and other persons not here relevant. Because the employees in this case did not perceive a need for legal advice, and because no attorney-client relationship was established, it is

difficult to see what these forms intended to accomplish other than to silence the employees by shielding their communications in the cloak of the attorney-client privilege. But unless the employees sought legal advice in an individual capacity, no attorney-client relationship was created with Samaritan's counsel. And, because these were employee-witnesses rather than employee-clients, the corporation's own privilege does not cover their statements. It is substance, not form, which controls.

## IV. CONCLUSION

We reject the control group test because it is inadequate to deal with the complexity of the attorney-client privilege in the corporate setting. It is both overinclusive and underinclusive. Because we reject the control group test, we also reject a qualified privilege for non-control group employees. We reject an expansive subject matter test for corporate employee communications. Instead, we adopt a functional approach and hold that where an employee is not seeking legal advice in confidence, his or her communications to corporate counsel are within the corporation's privilege if they concern the employee's own conduct within the scope of his or her employment and are made to assist the lawyer in assessing or responding to the legal consequences of that conduct for the corporation. This approach more closely approximates the nature and scope of the attorney-client privilege where the client is an individual. The employee communications here were not of this sort. Thus, they were not within the corporation's attorney-client privilege.

We affirm the order of the trial court but vacate that part of the opinion of the court of appeals that relates to the corporate attorney-client privilege.

FELDMAN, C.J., MOELLER, V.C.J., and CORCORAN and ZLAKET, JJ., concur.