**Stephanie YURICK, a protected person, through Bernard YURICK, M.D., Plaintiff,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY; et al., Defendants.**

**TIG Insurance Company, Plaintiff,**

v.

**Liberty Mutual Insurance Company; et al., Defendants.**

**Nos. CIV 99–766–PHX–ROS, CIV 99–1043–PHX–ROS.**

United States District Court, D. Arizona.

July 11, 2001.

Mark D. Samson, R. Douglas Dalton, Dalton Gotto Samson & Kilgard PLC, Phoenix, AZ, for Stephanie Yurick.

William J. Schrank, Donald L. Myles, Jr., Jones Skelton & Hochuli PLC, Phoenix, AZ, for Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company.

Mark Andrew Fuller, Dalton Gotto Samson & Kilgard PLC, Phoenix, AZ, Mark A. Sandberg, Sandberg Wuestenfeld & Corey, Anchorage, AK, for John/Jane Does, 1–10.

### AMENDED ORDER

SILVER, District Judge.

### *Background*

On August 7, 1995, Stephanie Yurick ("Yurick") was seriously injured in an automobile accident with a Tandy Corporation ("Tandy") truck. Tandy maintained primary automobile liability insurance from Defendant Liberty Mutual Insurance Company ("Defendant") in the amount of $5 million and excess insurance from Transamerica Insurance Group ("Plaintiff") in the amount of $20 million. On April 26, 1999, Yurick filed an action against Defendant. This action was settled on January 4, 2001.

On June 11, 1999, Plaintiff filed a bad faith action against Defendant, alleging that Defendant knew that there was a "substantial probability" that Yurick's damages would exceed the limits of its primary $5 million coverage and that Defendant therefore had a duty to evaluate and promptly settle the Yurick claim. (Compl. ¶¶ 11–13.) Plaintiff alleges that Defendant should have promptly investigated and settled the Yurick claim using only the $5 million available under its policy, but that did "little or nothing" to resolve the Yurick claim until 1997. (*Id.* ¶¶ 14,16.)

In 1997, Liberty tendered its policy limits to Plaintiff for settlement negotiations with Yurick. (*Id.* ¶¶ 18–19.) On June 20, 1997, Plaintiff reached a settlement with Yurick, which included "payments by Plaintiff that were far in excess of [Defendant's] primary coverage", and then sued Defendant. (*Id.* ¶ 20.)

On March 7, 2001, the Court conducted an *ex parte* hearing with counsel for Defendant to resolve whether Defendant's internal documents are discoverable, notwithstanding the attorney-client or work product privileges. The Court indicated that several of the documents at issue appeared protected by the attorney-client and work product privileges, but ordered Defendant to submit affidavits establishing the relationships between Defendant and the persons who created the documents in order to determine whether either privilege applied. On March 23, 2001, Defendant filed a Notice, setting forth a list of several confidential documents in the Retained Counsel, House Counsel, Paul Johnson, Karen Borrego, MS Mail Notes, and David Pitts files.[1] (*See* Notice at 2–3.) Pursuant to the Court's request, Defendant attached several affidavits stating that the documents were prepared as a consequence of threatened litigation by Yurick and Plaintiff. (*See* House Counsel Aff. ¶ 3; Johnson Aff. ¶ 3; Retained Counsel Aff. ¶ 2; Borrego Aff. ¶ 3.)

On April 5, 2001, Plaintiff filed a Response to Defendant's Notice, arguing that because Defendant is equitably subrogated to the claims of Tandy, the insured, and that the Yurick case has settled, Defendant cannot

---

1. Retained Counsel was hired in May 1997 by Defendant for the purpose of providing counsel and legal advice regarding Yurick and Plaintiff's claims. (Retained Counsel Aff. ¶¶ 1–2.) House Counsel for Defendant also provided legal advice and counsel with respect to threatened litigation by Plaintiff. (House Counsel Aff. ¶¶ 1–3.) Paul Johnson ("Johnson") is a Compliance Examiner in Defendant's Home Office who relied on the advice of counsel in evaluating, settling, and defending claims against Defendant. (Johnson Aff. ¶¶ 1,3.) Karen Borrego ("Borrego") is a Technical Claims Specialist for Defendant who handled Yurick's claim against Tandy. (Borrego Aff. ¶¶ 1,2.) Finally, David Pitts ("Pitts") is Defendant's Assistant Vice President and Operations Manager for Business. (House Counsel Aff. ¶ 4.)

invoke the attorney-client or work product privileges to shield the documents in question. (Resp. at 2.) On April 16, 2001, Defendant filed a Reply, asserting that because "the Court has already determined that many of these documents are protected on their face or presumptively privileged, they remain privileged and should not be produced simply because an equitable subrogation case has been filed." (Reply at 5.) Defendant also disputed whether the equitable subrogation principles applied, requiring disclosure of the documents.

On May 17, 2001 ("May 2001 hearing"), the Court held a hearing to discuss these issues and advised counsel that a written decision would be forthcoming.

### Discussion

### I. The Attorney–Client Privilege

The Ninth Circuit has set forth the following "essential elements" for invocation of the attorney-client privilege: (1) legal advice is sought, (2) from a professional legal adviser in his or her capacity as such, (3) the communication relates to that purpose, (4) is made in confidence, and (5) and by the client. *Admiral Ins. Co. v. U.S. Dist. Ct. for the Dist. of Ariz.*, 881 F.2d 1486, 1492 (9th Cir.1989) (citing *In re Fischel*, 557 F.2d 209, 211 (9th Cir.1977)). The Ninth Circuit in *In re Fischel*, 557 F.2d at 211, recognized that the privilege also protects the attorney's communications to the client, but held the privilege does not extend beyond the substance of the client's communications to the attorney.

Federal and Arizona law have extended the attorney-client privilege to communications made by corporate employees. *See Admiral*, 881 F.2d at 1492 (stating that the attorney-client privilege "applies to communications by any corporate employee regardless of position when the communications concern matters within the scope of the employee's corporate duties *and* the employee is aware that the information is being furnished to enable the attorney to provide legal advice to the corporation.") (emphasis added) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 394, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)); *Samaritan Found. v. Goodfarb*, 176 Ariz. 497, 862 P.2d 870, 876 (1993) ("When a corporate employee or agent communicates with corporate counsel to secure or evaluate legal advice for the corporation, that agent or employee is, by definition, acting on behalf of the corporation and not in an individual capacity. These kinds of communications are at the heart of the attorney-client relationship.").

"The party asserting attorney-client privilege has the burden of establishing all of the elements of the privilege." *United States v. Munoz*, 233 F.3d 1117, 1128 (9th Cir.2000) (citing *United States v. Plache*, 913 F.2d 1375, 1379 n. 1 (9th Cir.1990)).

The Court has reviewed all the documents at issue and finds the following.[2]

### A. The Retained Counsel File

The Court finds the attorney-client privilege applies to all communications from Retained Counsel to his client, that is, all communications he had with employees of Liberty which meet the specific criteria established in *Admiral*. In his affidavit, Retained Counsel states that he directly communicated with Karen Borrego, House Counsel, Paul Johnson, and David Pitts "regarding [Defendant's] legal rights and options concerning the threats of litigation by [Yurick and Plaintiff]." (Retained Counsel Aff. ¶ 3.) Retained Counsel also states that he was retained by Defendant "for the purpose of providing counsel and legal advice regarding threatened claims by [Yurick and Plaintiff] against Liberty Mutual." (*Id.* ¶ 2.) Further, at the May 2001 hearing, Defendant argued that Retained Counsel's affidavit makes clear that he was retained solely to represent Defendant.[3] Plaintiff

---

2. Defendant has submitted various documents located in the Retained Counsel, House Counsel, Paul Johnson, Karen Borrego, MS Mail Notes, and David Pitts files. The Court has analyzed the substance of all of the communications in these files. Although the Court does not expressly discuss each document, this Order applies to all the documents, because they are duplicative of each other.

3. Counsel for Defendant asserted that Retained Counsel was retained after May 8, 1997, when Plaintiff threatened Defendant with a bad faith action, and that Retained Counsel was retained

has not disputed these assertions. Thus, Defendant sufficiently established that Retained Counsel's communications with House Counsel, Borrego, Johnson, and Pitts involved communications for the purpose of providing Defendant with legal advice. *Admiral*, 881 F.2d at 1492.

Based on this information, the Court finds that documents RH 177, RH 178, and PCF 248, involving Retained Counsel's communications to Borrego, are protected under the attorney-client privilege. The fax cover sheet attached to these documents (PCF 248) clearly states that the information contained therein was "attorney/client privileged and confidential information[.]" (*See* PCF 248; Description of PCF 248–250 in Borrego File ("Proposed draft letters from [Retained Counsel] for Karen Borrego to consider sending to Wayne Howard, Esq. dated 5/13/97, discussing Liberty Mutual's position regarding settlement.").) Defendant has therefore met its burden of establishing that the attorney-client privilege should apply to these documents. *Munoz*, 233 F.3d at 1128; *Admiral*, 881 F.2d at 1492.

■ Defendant, however, has failed to establish that the following communication from Retained Counsel was made in confidence, an essential element of the attorney-client privilege:

> RH 119 [4]: Draft letter from Retained Counsel to Defendant's Home Office discussing conditions imposed by Plaintiff on policy limits.

*Admiral*, 881 F.2d at 1492. Although Defendant has sufficiently established that this communication involved Retained Counsel's communications to his client for the purpose of providing his client with legal advice, Retained Counsel's affidavit does not provide that the communications were made in confi-

dence. (*See* Retained Counsel Aff.) Because Defendant has the burden of establishing each element of the attorney-client privilege, Defendant has failed to meet its burden of establishing that the communication in document RH 119 was made in confidence. *Munoz*, 233 F.3d at 1128; *Admiral*, 881 F.2d at 1492.

■ Similarly, the Court finds that Borrego's communications to Retained Counsel are not protected by the attorney-client privilege because they do not meet the specific criteria in *Admiral*. In Borrego's affidavit, she states that her "communications with ... [Retained Counsel] were for the purpose of seeking legal counsel and advice with respect to the duties, rights and responsibilities of Liberty Mutual Insurance Company in light of the threats of litigation by [Yurick and Plaintiff]." (Borrego Aff. ¶ 3.) Borrego also states that as part of her responsibility of handling the Yurick claim, she frequently communicated with Retained Counsel. (*Id.* ¶ 2.) Although Defendant has sufficiently established that Borrego's communications concerned matters within the scope of her corporate duties and related to Retained Counsel's legal advice to Defendant, Borrego's affidavit does not provide that her communications were made in confidence, an essential element of the attorney-client privilege. *Admiral*, 881 F.2d at 1492. Because Defendant has again failed to meet its burden of establishing that the attorney-client privilege applies to Borrego's communications, the following communications are not protected under the privilege:

> (1) RH 186: Fax cover sheet from Borrego to Retained Counsel regarding the potential settlement with Yurick;
>
> (2) PCF 285–286, DP 60: Borrego's handwritten notes from her May 13, 1997 discussion with Retained Counsel; [5] and

specifically to provide advice to Defendant, not Tandy or Plaintiff.

4. Defendant has submitted a list of documents which contains several repeat documents. Again, the Court's findings apply to all documents which contain communications identical to the communications in the documents addressed if made solely between Retained Counsel and an employee.

5. The Court's analysis regarding Borrego's handwritten notes is based on Defendant's description of the documents provided in the Pitts' File. (*See* DP 60–62.) If the Court had based its decision solely on Defendant's description of the documents provided in the Borrego File, Defendant would not have met its burden of establishing that Borrego's notes were taken from her direct communication with Retained Counsel. (*See* Description of PCF 285–286 in Borrego File ("Claim file notes of Karen Borrego dated

(3) PCF 290: Borrego's notes describing May 15, 1997 conversation with Retained Counsel.

*See Munoz,* 233 F.3d at 1128; *Admiral,* 881 F.2d at 1492.

### B. The House Counsel File

The Court will also uphold the invocation of the attorney-client privilege for all communications from House Counsel to his client Liberty, which includes all of Defendant's employees, which meet the specific criteria established in *Admiral.* In his affidavit, House Counsel states that as inside counsel for Defendant, he was responsible for advising and providing legal advice for Liberty's claims personnel, who therefore constituted his clients. (House Counsel Aff. ¶ 2.) At the hearing, Defense counsel again argued that House Counsel's affidavit makes clear that he was specifically retained to represent Defendant, not Tandy, and that the documents in the House Counsel File involve advice given only to Defendant. Plaintiff has not offered evidence disputing these facts. Hence, the Court finds that House Counsel was not representing Tandy during the time that the communications were made.[6] House Counsel also states that he directly communicated with Retained Counsel and James Kelleher ("Kelleher"), Vice–President and Assistant General Counsel for Liberty, in order to provide "legal advice with respect to

[Defendant's] rights and responsibilities[.]" (*Id.* ¶ 6.) Further, House Counsel states that in order to provide legal advice to Defendant, he communicated in confidence with Borrego, Lenkowski, and Pitts. (*Id.* ¶ ¶ 4–5.) Based on this information, the Court finds that the following communications are protected under the attorney-client privilege because they involve House Counsel's confidential communications to his client relating to the legal advice sought by Defendant:

(1) LMRS 1: Letter from House Counsel to Donald Myles;

(2) LMRS 7[7]: Email communication from House Counsel to Johnson and Kelleher on May, 16, 1997, which expressly states that it is "Privileged & Confidential"; and

(3) LMRS 38: Email communication from House Counsel to Pitts on May 28, 1997.

*See Admiral,* 881 F.2d at 1492.

■ House Counsel's affidavit, however, fails to establish that the following communications were made in confidence, an essential element of the attorney-client privilege:

(1) LMRS 11: Email communication from House Counsel to Johnson on May 16, 1997; and

(2) MSMN 11: Email communication from House Counsel to Kelleher on June 11, 1997.

*Admiral,* 881 F.2d at 1492.

■ Defendant has also failed to meet its burden of establishing that communications

---

5/13/97 containing notes from conference with home office discussing settlement and release of Tandy."); Description of DP 60–62 in Pitts File ("Handwritten claim file notes of Karen Borrego dated 5/13/97 containing notes from discussion between Ms. Borrego and [Retained Counsel], and legal advice to Liberty Mutual.")). *See also United States v. Motorola, Inc.,* No. Civ. 94–2331, 1999 WL 552553, at *5 (D.D.C. May 28, 1999) ("Disclosure of the client's notes of what he told the attorney would have the same inhibiting effect on the client as asking him directly to state what he told the attorney in *confidence.*") (emphasis added); *Royal Surplus Lines Ins. Co. v. Sofamor Danek Group, Inc.,* 190 F.R.D. 505, 515 (W.D.Tenn.1999) (stating that the attorney-client privilege applied to handwritten notes describing a discussion between an attorney and a client "for the purposes of legal advice [which] was intended to be *confidential*[.]") (emphasis added); *cf. In re Ford Motor Co.,* 110 F.3d 954, 967 (3d Cir.1997) (refusing to find that handwritten notes were protected under the attorney-client privilege because the notes did not involve *"con-*

*fidential* communications made to secure legal advice") (emphasis added); *Blumenthal v. Drudge,* 186 F.R.D. 236, 241 (D.D.C.1999) (stating that a party's notes did not contain protected information because they merely contained conversations between a non-lawyer and other third parties).

**6.** The Court is aware of the Arizona Supreme Court's holding in *State Farm Mut. Auto. Ins. Co. v. Lee,* 199 Ariz. 52, 13 P.3d 1169, 1175 (2000), that when an insurance company asserts a defense of good faith, which necessarily incorporates communications between the company and counsel, the company impliedly waives the attorney-client privilege and the communications between the company and counsel are discoverable. The parties, however, have not briefed the issue. Therefore, it will not be addressed and resolved at this time.

**7.** Documents LMRS 7–9 and 13 are the same as documents MSMN 1–3.

made by Pitts, Lenkowski, and Kelleher to House Counsel concerned matters within the scope of their corporate duties and that each of these corporate employees were aware that the information was being furnished to enable House Counsel to provide legal advice to Defendant. *Admiral,* 881 F.2d at 1492; *Munoz,* 233 F.3d at 1128. In fact, Defendant has failed to offer the affidavit testimony of Pitts, Lenkowski, and Kelleher regarding their communications with House Counsel. The Court therefore finds that the following communications are not protected under the attorney-client privilege:

(1) LMRS 9 (same as LMRS 12): Email communication from Pitts to House Counsel on May 16, 1997;[8]

(2) LMRS 11: Email communication from Lenkowski to House Counsel on May 13, 1997;

(3) LMRS 38: Email communication from Pitts to House Counsel on May 28, 1997;

(4) HOXPJ 51: Fax cover sheet from Pitts to House Counsel on May 16, 1997;

(5) MSMN 6: Email communication from Pitts to Grylls and House Counsel on May 16, 1997; and

(6) MSMN 11: Email communications from Pitts to House Counsel and from Kelleher to House Counsel on June 11, 1997.

■ Defendant has also failed to meet its burden of establishing that the communications in document LMRS 8 are protected under the attorney-client privilege. *Munoz,* 233 F.3d at 1128. Document LMRS 8 involves a communication between Susan

Grylls and David Pitts on May 16, 1997, which was carbon copied to House Counsel. Defendant has failed to offer any legal authority establishing that the attorney-client privilege extends to such communications.[9] *See Cont'l Ill. Nat'l Bank and Trust Co. of Chicago v. Indemnity Ins. Co. of N. Am.,* No. C 87–8439, 1989 WL 135203, at *3 (N.D.Ill. Nov.1, 1989) (stating that a letter which merely assigned a carbon copy to an attorney fell beyond the scope of the attorney-client privilege because it was "not primarily directed to an attorney", did not seek legal advice, and merely served to keep the attorney informed of the contents of the letter); *Royal Surplus Lines Ins. v. Sofamor Danek Group,* 190 F.R.D. 463, 475 (W.D.Tenn.1999) ("Simply sending a carbon copy to in house counsel does not cloak a routine business communication with attorney client privilege. The communication must have been for the purpose of securing legal advice.").

■ In addition, document LMRS 13 involves a communication between Borrego and David Pitts, which expressly discusses legal advice from Retained Counsel.[10] Defendant has failed to meet its burden of offering sufficient legal authority and/or factual information to establish that the attorney-client privilege should be extended to a communication solely between Retained Counsel's client's employees. *Munoz,* 233 F.3d at 1128. In particular, absent from the affidavits is any indication that Retained Counsel directed Borrego to communicate the contents of document LMRS 13 to Pitts on Retained Counsel's behalf.[11]

8. The Court will not protect the email communication from Borrego to Susan Grylls printed on document LMRS 9, because the email was not sent to or from Retained Counsel or House Counsel, and it does not meet the *Admiral* requirements for protection of attorney-client communications. (*See* Discussion at 9.)

9. For the same reason, the Court finds that documents MSMN 8, 9, 14, and 15 are not protected under the attorney-client privilege. Documents MSMN 14 and 15 involve email communications between Borrego and Pitts on June 20, 1997, which were carbon copied to House Counsel. At the May 2001 hearing, Defendant argued that because all communications occurred after December 1996, the damages period established in Plaintiff's claims, these communications are not

relevant. Plaintiff appeared to have conceded at the May 2001 hearing that the June 1997 communications are not relevant, but reminded the Court that relevance was not the issue to be decided at the hearing. The issue of relevance has not been briefed and may be the subject for later motions. Thus, this Order does not address the relevance of all documents, including MSMN 14 and 15.

10. Document LMRS 13 also involves an email communication between Grylls and Borrego on May 15, 1997, which discusses Tandy's involvement in an interpleader.

11. The Court acknowledges that in her affidavit, Borrego expressly states that she "was directed by [Retained Counsel] to research and investigate

## II. The Work Product Privilege

■ The work product privilege provides a qualified immunity for materials prepared in anticipation of litigation by a party, an attorney, or other representatives of the party. *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In an effort to address the inconsistent opinions in federal courts after the *Hickman* decision, in 1970 the Supreme Court adopted Federal Rule of Civil Procedure 26(b)(3), which provides in relevant part:

> [A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

Fed.R.Civ.P. 26(b)(3); *see also* 1997 Advisory Committee Notes for Rule 26(b)(3), *reprinted in* Wright & Miller, *Federal Practice and Procedure*, App. C at 435–436.

■ Pursuant to Fed.R.Civ.P. 26(b)(3)[12], the following conditions must be satisfied in order to establish work product protection: (1) the material must be a document or tangible thing; (2) the material must be prepared in anticipation of litigation; and (3) the material must be prepared by or for a party, or by or for its representative. *Tayler v. Travelers Ins. Co.*, 183 F.R.D. 67, 69 (N.D.N.Y. 1998) (citing *Compagnie Francaise d'Assur-*

*ance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 41 (S.D.N.Y. 1984); *In re Grand Jury Subpoenas*, 561 F.Supp. 1247, 1257 (E.D.N.Y.1982)). "[T]here is no work product immunity for documents prepared in the ordinary course of business prior to the commencement of litigation." *Tayler*, 183 F.R.D. at 70.

There are two types of work product recognized, ordinary work product and opinion work product, and generally opinion work product, including mental impressions, conclusions, opinions or legal theories, is entitled to nearly absolute protection. *Holmgren v. State Farm Mutual Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir.1992) (holding that opinion where product is entitled to nearly absolute protection with some limited exceptions). Ordinary work product, by contrast, is subject to disclosure upon a showing by the party seeking discovery of substantial need and its inability to obtain the materials by other means. *See Upjohn*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (declining to decide whether opinion work product is entitled to absolute protection but recognizing that ordinary work product is discoverable upon a showing of substantial need an inability to obtain materials without undue hardship).

■ The burden of establishing protection of alleged work product is on the proponent, and it must be specifically raised and demonstrated rather than asserted in a blanket fashion. *See Shiner v. Am. Stock Exch.*, 28 F.R.D. 34, 35 (S.D.N.Y.1961); *Tayler*, 183 F.R.D. at 69.

### A. Whether the Documents Constitute Work Product

The Court finds that all of the purported work-product documents submitted to the

---

certain issues and communicate with others at Liberty Mutual as part of the fact finding mission in determining Liberty Mutual's rights and responsibilities in the face of threatened legal action." (Borrego Aff. ¶ 3.) This broad allegation, which attempts to sweep within its ambit all communications between employees, does not meet the rigorous requirements of *Admiral*. A blanket claim of the privilege is not sufficient. *Admiral*, 881 F.2d at 1492; *Munoz*, 233 F.3d at 1128. Specific protection of *each* communication must be established for the Court to afford protection.

12. At the May 2001 hearing, Defendants requested the Court to evaluate the documents in question in light of *Brown v. Superior Ct. In and For Maricopa County*, 137 Ariz. 327, 670 P.2d 725 (1983). *Brown* involved the Arizona Supreme Court's analysis of Ariz. R. Civ. P. 26(b)(3), which is relevant only because it is identical to Fed.R.Civ.P. 26(b)(3). Because this is an action founded on diversity jurisdiction, the Court must apply the Federal Rules of Civil Procedure. *See Hanna v. Plumer*, 380 U.S. 460, 465, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

Court for review are entitled to work product protection because they were prepared by Defendant or its agents in anticipation of potential litigation against Plaintiff. *Holmgren,* 976 F.2d at 576; *Tayler,* 183 F.R.D. at 70. Further, the documents created by Defendant's agents constitute work product, because they were prepared under the direction of Retained Counsel and House Counsel in anticipation of litigation. *See Thomas Organ Co. v. Jadranska Slobodna Plovidba,* 54 F.R.D. 367, 372 (N.D.Ill.1972) ("[D]ocuments and investigative reports compiled by a nonattorney for an attorney and/or under his general direction in anticipation of litigation were protected from discovery absent the requisite showing of need."). (*See also* House Counsel Aff. ¶¶ 4–5 (stating that he instructed Borrego, Lenkowski, and Pitts to gather information and investigate the facts regarding the threatened litigation by Plaintiff and to keep such information confidential)).

### B. Whether the Documents Constitute Protected Work Product

A party may obtain discovery of an opposition's work product "only upon a showing that the party seeking discovery has *substantial need* of the materials in the preparation of the party's case and that the party is unable *without undue hardship* to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3) (emphasis added). Further, though mental impressions, conclusions, opinions, or legal theories are entitled to nearly absolute protection, "opinion work product may be discovered and admitted when *mental impressions are at issue in a case and the need for the material is compelling.*" *Holmgren,* 976 F.2d at 577 (emphasis added) (citations omitted). "In a bad faith insurance claim settle-

ment case, the 'strategy, mental impressions and opinion of [the insurer's] agents concerning the handling of the claim are directly at issue.'" *Id.* (quoting *Reavis v. Metro. Prop. & Liability Ins. Co.,* 117 F.R.D. 160, 164 (S.D.Cal.1987)); *see also Brown,* 670 P.2d at 735 (stating that mental impressions, opinions, or legal theories of an attorney or other representative of a party concerning litigation were discoverable because they were central issues in the plaintiff's claim for bad faith and "[w]hen mental impressions and the like are directly at issue in a case, courts have permitted an exception to the strict protection of Rule 26(b)(3) and allowed discovery.") [13] (citations omitted).

Similarly, the Court finds that though the documents in question constitute work product, they may not be protected work product, because the strategy, mental impressions, and opinion of Retained Counsel, House Counsel, and Defendant's agents concerned the handling of the Yurick settlement, which in turn, are directly at issue in Plaintiff's bad faith action. *Holmgren,* 976 F.2d at 577; *Brown,* 670 P.2d at 735. Thus, Defendant's argument that the documents in question constitute protected work product may be unpersuasive if Plaintiff establishes "substantial need" for the documents pursuant to Fed.R.Civ.P. 26(b)(3). Plaintiff must establish "substantial need" for the work product documents on or before June 20, 2001, and if Plaintiff meets its burden, the Court will permit discovery of all of the documents which are work product, but *not* the attorney-client communications which the Court has ruled in this Order are entitled to protection.

### III. Subrogation and Privileged Documents

▮ Under Arizona law, "an excess carrier is subrogated to the rights of the insured

---

**13.** The Arizona Supreme Court stated the following regarding evidentiary issues in bad faith actions:

> [B]ad-faith actions against an insurer, like actions by client against attorney, patient against doctor, can only be proved by showing exactly *how the company processed the claim, how thoroughly it was considered* and *why the company took the action it did.* The claims file is a unique, contemporaneously prepared history of the company's handling of the claim; in an

action such as this the need for the information in the file is not only substantial, but overwhelming.... The 'substantial equivalent' of this material cannot be obtained through other means of discovery. The claims file 'diary' is not only likely to lead to evidence, but to be very important evidence on the issue of whether [the insurer] acted reasonably.

*Brown,* 670 P.2d at 734 (emphasis added) (citing *APL Corp. v. Aetna Cas. & Sur. Co.,* 91 F.R.D. 10, 13–14 (D.Md.1980)).

and has a cause of action against the primary insurer for bad faith failure to settle within policy limits." *Hartford Acc. & Indem. Co. v. Aetna Cas. & Sur. Co.*, 164 Ariz. 286, 792 P.2d 749, 754 (1990). The excess insurer's rights, however, are no greater than the insured's rights. *Id.* (citation omitted).

Courts have held that in bad faith actions by an excess carrier against a primary insurance carrier, the attorney-client and work product privileges do not attach to communications between the insurance company and its attorney because the duty owed to the excess carrier by the primary carrier is identical to that owed to the insured. *See Central Nat'l Ins. Co. of Omaha v. Med. Protective Co. of Fort Wayne*, 107 F.R.D. 393, 395 (E.D.Mo.1985); *Zurich Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 137 A.D.2d 401, 402, 524 N.Y.S.2d 202, 203 (N.Y.App.Div. 1988) ("Where it is alleged that the insurer has breached [its] duty to its insured, the insurer may not use the attorney-client or work product privilege as a shield to prevent disclosure which is relevant to the insured's bad faith action. . . . Thus, the same principle obtains in a bad faith action between the excess insurer and the primary insurer."). The attorney-client and work product privileges do not apply to communications between the insurance company and its attorney because the attorney is deemed to have represented both the insured and the excess carrier as its clients in a matter of common interest.[14] *See Central Nat'l*, 107 F.R.D. at 394 (reasoning the attorney-client privilege does not attach to communications between an attorney and an insurance company because that attorney represented both the insured and the insurer).

■ Defendant distinguishes *Central Nat'l* and *Zurich* on their facts, arguing that Retained Counsel and House Counsel represented Defendant only during the settlement negotiations, and that Plaintiff and Tandy shared no common interest with regard to this representation. The Court agrees with Defendant that *Central Nat'l* and *Zurich* appear to involve situations where the insured was represented during actual litigation by independent counsel hired by the insurance company, and that the affidavits filed by Retained Counsel and House Counsel establish that they represented Liberty solely during the relevant time period, and not the insured. There is nothing in all the documents reviewed by the Court which detracts from or undermines Defendant's position that Retained Counsel and House Counsel represented only Defendant during the relevant time period. Thus, the Court has no reason to find that Defendant ever appointed Retained Counsel and House Counsel to represent Tandy. Without clear authority requiring the Court to extend the holdings in *Central Nat'l* and *Zurich* to cases where primary insurance carriers obtain independent counsel solely to represent the insurance company, the Court refuses to make such an extension. Plaintiff's argument that the documents are not protected because of subrogation therefore fails.[15]

Accordingly,

**IT IS ORDERED** that the communications in documents RH 177, RH 178, PCF 248, LMRS 1, LMRS 7, and LMRS 38 (involving only the email communication from House Counsel to Pitts on May 28, 1997) are protected under the attorney-client privilege, and that all other communications alleged to

14. In its Reply, Defendant argues that *Central Nat'l* and *Zurich* are not controlling and that *Am. Auto. Ins. Co. v. J.P. Noonan Transp., Inc.*, No. 970325, 2000 WL 33171004 (Mass.Super.Nov. 16, 2000), is applicable which states that subrogation provides a shield for attorney-client communications only if the communications were privileged before subrogation occurred. (Reply at 4.)

*Noonan*, however, cites *Central Nat'l* with approval and does not question its holding that the attorney-client and work product privileges do not attach to communications between a primary insurance carrier and its attorney in an action by an excess carrier, because the duty owed to the excess carrier by the primary carrier is identical to that owed to the insured. *See Noonan*, 2000 WL 33171004 at *4. In fact, *Noonan* does not address this issue and explicitly states that *Central Nat'l* "involved a significantly different situation" than the facts before the court. *Id.*

15. This appears academic because of the Court's specific rulings previously set forth in this Order, regarding the applicability of the work product and attorney-client privileges.

be protected are not protected by the attorney-client privilege.

**IT IS FURTHER ORDERED** that all of the documents claimed by Defendant to be protected by the work product privilege are protected, but that Plaintiff has until June 22, 2001 to establish "substantial need" for the work product documents pursuant to Fed.R.Civ.P. 26(b)(3). Defendant's Response must be filed on or before July 6, 2001, and Plaintiff's Reply must be filed on or before July 20, 2001. The Court will rule on whether these work product documents are protected after such briefing is complete.