Brian Keith SELL, Plaintiff,

v.

COUNTRY LIFE INSURANCE COMPANY, Defendant.

No. CV-15-00353-PHX-DJH

United States District Court, D. Arizona.

Signed June 1, 2016

---

Anita Rosenthal, Sander Ruggill Dawson, Steven C. Dawson, Dawson & Rosenthal PC, Sedona, AZ, for Plaintiff.

Bret Steven Shaw, Thomas P. Burke, II, Burke Panzarella Rich, Phoenix, AZ, for Defendant.

## ORDER

Honorable Diane J. Humetewa, United States District Judge

This matter is before the Court on Plaintiff's Motion for Sanctions (Doc. 150), which included over 100 pages of attachments and a supporting Declaration (Doc. 151). Defendant has filed a Response (Doc. 163) with over 200 pages of attachments, and Plaintiff has filed a Reply (Doc. 165), also with attachments.

The Court held an evidentiary hearing on the motion on April 14 and 15, 2016. At the hearing, Plaintiff presented portions of videotaped deposition testimony from claims analyst Colleen Payne ("Ms. Payne") and her supervisor Liz Shepard ("Ms. Shepard"). One of Plaintiff's attorneys, Sander Dawson, also testified. He described his involvement in the discovery process and the issues that arose in this case. Defendant called three witnesses at the hearing: Ms. Payne; J. Matthew Anderson ("Mr. Anderson"), claims attorney for Defendant; and Gregory Bee, chief information security officer for Defendant. The parties also submitted numerous exhibits for the hearing. As stated on the record, the Court admitted some of the exhibits into evidence and declined to consider others for purposes of deciding the instant motion.

Plaintiff argues in the motion that Defendant "engaged in a scheme designed to mislead the Court, the jury, and Plaintiff by concealing documents, fabricating evidence, and suborning perjury." (Doc. 150 at 1).[1] Plaintiff claims that Defendant's serious misconduct has harmed the integrity of the judicial process, and warrants the severe sanction of striking Defendant's Answer, entering a default judgment, and holding a trial on the issue of damages.

In response, Defendant claims it "has not violated any court order or rule, nor the spirit of discovery or disclosure." (Doc. 163 at 1). Defendant contends that Plaintiff's motion is based on misleading assertions of fact and law and should be denied.

## I. Background

Plaintiff initiated this action by filing a Complaint in Maricopa County Superior Court on October 24, 2014. (Doc. 1-1). He alleges in the Complaint that Defendant wrongfully denied his claim for benefits under a disability insurance policy Defendant issued to him in September 2000. (Id.). Plaintiff alleges that he suffers from severe chronic back pain, gastro-intestinal problems, depression and anxiety, among other conditions. (Id.). Between January 2010 and January 2012, he underwent three spinal surgeries, including two cervical disc fusions and a thoracic laminectomy. (Doc. 1-1 at 5).

Initially, Defendant approved Plaintiff's medical disability claim and paid him benefits from January 2012 to March 2012. (Doc. 1-1 at 6). In April 2012, Plaintiff was notified that as of March 8, 2012, his claim would be considered under the mental disorder provision of his policy and that his benefits were on hold until he could show he was under the care of a licensed psychiatrist or psychologist. (Doc. 150-2 at 2).[2]

---

1. Citations to filed documents and page numbers within those documents reflect the document numbers and page numbers generated by the District Court's electronic filing system.

2. Although the Court initially stated at the evidentiary hearing (Doc. 199 at 5) that it would not consider Exhibit 2 to Plaintiff's Motion for Sanctions (Doc. 150-2) for purposes of deciding the motion, the Court later

On October 26, 2012, Defendant terminated his claim altogether. (Doc. 150-11 at 2-4). Based on these and other allegations, Plaintiff raised two claims for relief in the Complaint: breach of contract, and insurance bad faith (breach of the covenant of good faith and fair dealing). (Doc. 1-1).

On February 26, 2015, Defendant removed the state court action to this Court. (Doc. 1). Defendant filed an Answer (Doc. 7) on March 4, 2015, in which it denied the allegations underlying Plaintiff's claims for relief. The Court thereafter issued a Rule 16 Scheduling Order (Doc. 13) on April 10, 2015 and granted the parties' requests for modifications to the scheduling order on November 24, 2015. (Doc. 66).

## II. Legal Standards for Imposition of Sanctions

■■■ A district court has inherent power "to levy sanctions in response to abusive litigation practices." *Leon v. IDX Systems*, 464 F.3d 951, 958 (9th Cir.2006). "This inherent power is not limited by overlapping statutes or rules" and "can be invoked even if procedural rules exist which sanction the same conduct." *Haeger v. Goodyear Tire & Rubber Co.*, 813 F.3d 1233, 1243 (9th Cir.2016) (citations and internal quotations omitted). Although Rule 37 of the Federal Rules of Civil Procedure "also provides a method to sanction a party for failing to comply with discovery rules, it is not the exclusive means for addressing the adequacy of a discovery response." *Id.* at 1243–1244.

■■■ "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). The imposition of sanctions pursuant to the district court's inherent power "is warranted where a party has acted in bad faith, that is, 'vexatiously, wantonly, or for oppressive reasons.'" *Surowiec v. Capital Title Agency*, 790 F.Supp.2d 997, 1010 (D.Ariz.2011) (quoting *Chambers*, 501 U.S. at 45–46, 111 S.Ct. 2123); *see also Haeger*, 813 F.3d at 1244 (holding that "[b]efore awarding sanctions pursuant to its inherent power, the court must make an express finding that the sanctioned party's behavior constituted or was tantamount to bad faith.") (internal quotations and citations omitted); *Anheuser–Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir.1995) ("For dismissal to be proper, the conduct to be sanctioned must be due to willfulness, fault, or bad faith.") (internal quotations and citations omitted). In addition, "[d]ue process concerns further require that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression 'threaten[s] to interfere with the rightful decision of the case.'" *Anheuser–Busch*, 69 F.3d at 348 (quoting *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 591 (9th Cir.1983)).

■■■ "Courts have the inherent power to impose various non-monetary sanctions" including default or dismissal. *Haeger*, 813 F.3d at 1251 (citing *Thompson v. Hous. Auth. of Los Angeles*, 782 F.2d 829, 831 (9th Cir.1986)). "It is well-settled that dismissal is warranted where ... a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings: 'courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.'" *Anheu-*

agreed that it should be considered. (Doc. 199 at 45-46). Regardless, the documents in Exhibit 2 were in the claim file that was previously disclosed to Plaintiff and there is no dispute over their content. The documents in the exhibit speak for themselves. The Court relies on them here as relevant background information.

*ser–Busch*, 69 F.3d at 348 (quoting *Wyle*, 709 F.2d at 589).

Further, before dismissing a case or declaring a default as a sanction, a district court must consider five factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the other party; (4) the public policy favoring the disposition of cases on the merits; and (5) the availability of less drastic sanctions." *Adriana International Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir.1990) (citations omitted); *see also Anheuser–Busch*, 69 F.3d at 348 (same); *Leon*, 464 F.3d at 958 (same). The district court, however, "need not make explicit findings regarding each of these factors" but must make a finding of "willfulness fault or bad faith" for dismissal or default to be proper. *Leon*, 464 F.3d at 958.

## III. Findings and Analysis

### A. Conduct Regarding Discovery Requests

#### 1. Facts

Pursuant to the initial disclosure deadline in the Scheduling Order (Doc. 13), Defendant produced the claim file to Plaintiff on April 30, 2015. (Doc. 150 at 4). Among the many documents in the claim file was a "DI Claims Review Form" dated September 30, 21012, with notes from Ms. Payne that she asked Ms. Shepard to review. (Doc. 150-2 at 4). In the notes, Ms. Payne wrote that Plaintiff had not been paid under his disability policy since March 2012, and that in addition to needing to be paid, Plaintiff needed a decision on whether the claim is psychological or medical. (*Id.*). Ms. Payne expressed her opinion that this was a medical claim and that there was not enough information to say the claim is psychological. (*Id.*).

Despite Ms. Payne's opinion in the notes, Plaintiff's disability benefits were, as noted above, terminated altogether in a letter dated October 26, 2012 and signed by Ms. Shepard. (Doc. 150-2 at 6-8). The letter stated that the medical records showed no continuing disability. (*Id.*). As referenced, Defendant had initially paid Plaintiff benefits under his disability policy for two months from January through March 2012 due to back and neck pain. (Doc. 150-2 at 2-3). However, in a letter to Plaintiff on April 25, 2012, signed by the previous claim analyst, Linda Pate, he was told that as of March 8, 2012, his claim would be considered under the mental disorder provision of his policy for addiction to pain medication, provided he could demonstrate he was under the care of a psychiatrist or psychologist. (*Id.*). As reflected in the letter, benefits for mental disorders were limited to a lifetime maximum of two years, unlike benefits for medical conditions which are payable until the claimant reaches age 65. (*Id.*).

Based on a gap in the claim file documents, Plaintiff propounded Requests for Production on June 3, 2015, including RFP No. 28 which asked Defendant to "produce all documents that are within the possession, custody or control of Country Life that refer to Plaintiff, Brian Keith Sell, the Disability Insurance Policy, or his claims on the Disability Insurance Policy, including all underwriting documents, and Policy service files and communications." (Docs. 151 at 1 and 150-5 at 3). In its response on July 2, 2015, Defendant asserted "its general objections to this request" and further objected that the "request is not limited to time or source and requests files that are privileged work-product or attorney-client communications." (*Id.*). Apart from the claim file that had already been disclosed, Defendant produced no documents in response to RFP No. 28. (*See id.*). Plaintiff's counsel followed up on July 30, 2015 with Defendant regarding this assertion of privilege and explained, with citations to legal authority, that Defendant was required to

provide a privilege log. (Doc. 104-3 at 8-10). Counsel for Defendant responded on August 14, 2015 that they were unaware of any documents related to this case that had not been disclosed, with the exception of privileged communications between Defendant and its outside counsel after the lawsuit had been filed. (Doc. 104-5 at 4).

To ensure the scope of his prior request for production encompassed all documents pertaining to Plaintiff's claim, Plaintiff propounded RFP No. 67 on September 2, 2015, which sought "any and all Documents relating to any and all meetings, phone calls, and/or verbal communications pertaining to Mr. Sell's Claim." (Doc. 151-1 at 4). In response, on October 5, 2015, Defendant again asserted "its general objection to this request." (Doc. 151-1 at 6). Defendant further responded that all such documents were included in the claim file that was disclosed as part of its initial disclosure statement. (*Id.*).

The depositions of Ms. Payne and Ms. Shepard occurred on September 23 and 25, respectively. (Docs. 150-4 at 2 and 150-3 at 2). The day before Ms. Payne's deposition, Defendant served its Fifth Supplemental Disclosure (Doc. 37), which was a draft denial letter dated October 16, 2012. (Doc. 150-8). One line at the bottom of the letter was redacted. (*Id.*). In her deposition, Ms. Payne testified that she wrote the draft denial letter, even though a different denial letter signed by Ms. Shepard was ultimately sent to Plaintiff. (Doc. 200 at 98-99). With the supplemental disclosure, Defendant provided a privilege log, asserting that the letter (presumably the redacted portion), contained "the mental thoughts, impressions and/or work product information prepared by, or on behalf of, defendant's attorneys." (Doc. 151-1 at 4). Later the same day, Defendant served an Amended Fifth Supplemental Disclosure (Doc. 38) that added two additional claims of privilege pertaining to the draft denial letter. (Doc. 151-1 at 5). In addition to the work product assertion, Defendant claimed that the draft denial letter "was prepared and/or created following the commencement of litigation by plaintiffs, and was created or prepared by, or at the direction of, defendant's attorney," and that it was protected by the attorney client privilege because it contained communication to or from counsel seeking counsel's opinions or impressions on legal issues. (*Id.*).

At the evidentiary hearing, Mr. Anderson, an attorney employed as claims counsel for Defendant, testified that shortly before the depositions were to occur, he directed Ms. Payne to search her computer to see if any documents pertaining to Plaintiff could be located. (Doc. 200 at 135, 140). He stated that as a result of that search, which was done with Ms. Shepard's assistance, the October 16 draft denial letter was discovered. (Doc. 200 at 139). Ms. Payne testified that she discovered the letter the Friday before her scheduled deposition. (Doc. 201 at 107-108). Mr. Anderson, who testified that "the discovery responses start with [him]" said nothing about why he did not direct Ms. Payne, or anyone associated with Plaintiff's claim, to search their computer hard drives before the initial disclosure deadline or upon receiving any of Plaintiff's requests for production. Instead, he claims he waited until shortly before Ms. Payne's deposition to make that request of Ms. Payne.

Plaintiff argues that the draft letter was intentionally withheld until the day before Ms. Payne's deposition to support Ms. Payne's assertion at her deposition that she changed her mind regarding Plaintiff's disability claim and ultimately agreed that Plaintiff's benefits should be terminated. (Doc. 150 at 2-3). Although there is no direct evidence this document was withheld for that purpose, that inference can be drawn in light of information discovered

later including the content of the redacted statement at the bottom of the draft letter and Ms. Payne's deposition testimony. If the document was truly discovered the way Mr. Anderson described, it begs the question why the request for Ms. Payne to search her computer was not made sooner, either in preparation for initial disclosures, or in response to Plaintiff's RFP No. 28. Mr. Anderson's testimony that the approaching deposition prompted the search request lacks credibility.

Following the depositions, Plaintiff believed additional responsive documents to RFP No. 28 existed, and presented the issue to the Court as a discovery dispute. (Doc. 150 at 8; Doc. 54 at 2). Defendant responded that it had answered RFP No. 28 "after a reasonable search" and that it had supplemented its disclosures upon the discovery of new documents. (Doc. 54 at 4). On November 13, 2015, finding Defendant's vague response to be insufficient, the Court ordered Defendant to perform a comprehensive search and produce documents responsive to the request. (Doc. 61 at 3).

Based on the Court's order, Defendants produced an additional 929 documents responsive to RFP No. 28. (Doc. 150 at 8). Although many of the documents were standard forms and of little value, embedded in the disclosure were four emails between Ms. Payne, Ms. Shepard, and the previous claims attorney, Rob Darner.[3] (Doc. 150 at 8). Defendant completely redacted the content of the four emails and their attachments, claiming they were protected by the attorney-client privilege and as attorney work product. (*Id.*). Also included in the disclosure was a meeting notice that stated a meeting regarding Mr. Sell and involving Ms. Payne, Ms. Shep-

ard, Mr. Darner and Pam Newby was scheduled for October 15, 2012 at 8:00 a.m. (Doc. 150-9 at 14).

Plaintiff challenged Defendant's assertion of privilege over the redacted emails and the redacted last line of Ms. Payne's draft denial letter by presenting it to the Court as a discovery dispute. (Doc. 88). The Court then allowed additional briefing on the issue. (Doc. 89). In its brief to support its assertions of privilege, Defendant contended that "each communication at issue should remain privileged, as they are communications seeking legal advice regarding policy terms, communications seeking legal compliance review for outgoing correspondence, or both." (Doc. 98 at 4). Concluding that Defendant failed to demonstrate that the challenged emails (including the attached draft letters) were exchanged "with a purpose of 'providing or securing legal advice,'" the Court ordered Defendant to produce, in un-redacted form, the challenged emails and the October 16 draft termination letter. (Doc. 115 at 4-5).

. . . .

## 2. Discussion

### a. Failure to Comply with Rule 34

█ The Court finds that Defendant's and counsels' conduct during the discovery process violated the letter and spirit of the discovery rules. Defendant and its attorneys are apparently of the view that once they disclosed the claim file, they had fulfilled their discovery obligations and were required to do nothing further to locate information pertaining to Plaintiff's claims in this lawsuit. Instead of conducting an appropriate search upon receiving Plain-

---

3. It became clear later that one of the four emails included the draft denial letter prepared by Ms. Payne on October 16, 2015. This time, however, the entire letter was redacted, as opposed to only the last line being redacted when it was disclosed the day before Ms. Payne's deposition as Defendant's Fifth Supplemental Disclosure. (Doc. 150 at 9).

tiff's requests for production, Defendant and its lawyers told Plaintiff, and the Court, that they had conducted a reasonable search and there was nothing to disclose other than the claim file. That, however, was not true.

As the evidentiary hearing revealed, the only mechanism Defendant has in place for long-term preservation of email communications, including for litigation and other purposes, is the "semantic enterprise vault" (the "Vault"). (Doc. 201 at 137-138).[4] Emails between the relevant employees involved in a particular insured's claim are preserved in the Vault from the date Defendant is served with a lawsuit by the claimant and a "litigation hold" is put in place. (Doc. 163-22 at 2-4; Doc. 200 at 111-112). Given the prevalence of email communications in Defendant's (and virtually every other) business, any search for documents in response to Plaintiff's requests for production should necessarily have included a search of the Vault. Defendant, however, did not search the Vault after receiving Plaintiff's multiple requests for production referenced above. Not until Plaintiff was forced to seek an order from the Court based on his well-founded belief that relevant, discoverable documents had not been disclosed, did Defendant finally perform a search of the Vault.

Defendant's failure to perform the search and produce the documents uncovered by the search, until required to do so by a Court order, violated the discovery rules. *See* Fed.R.Civ.P. 34(a) (authorizing a party to request the production of documents or electronically stored information that is within the scope of Rule 26(b)). Plaintiff's RFP Nos. 28 and 67 sought information within the scope of Rule 26(b) and he was entitled to receive that information. Defendant's and counsels' assertions in response to the discovery requests that after a "reasonable search" no additional documents were found were not true. Any definition of a reasonable search would necessarily include the only available source of preserved email communications. Defendant presented no evidence through Mr. Anderson, or any other source, that it conducted **any** search, let alone a reasonable one, in response to Plaintiff's requests for production. Defendant's claim that it did nothing wrong because it later complied with the Court's order for a comprehensive search completely misses the mark. Defendant had an affirmative obligation to comply with the requests for production and, instead of doing so, it misled Plaintiff and the Court by asserting that it had complied. Defendant's willful misconduct warrants the imposition of sanctions.

The Court's conclusion is not altered by Mr. Anderson's testimony at the evidentiary hearing that he was not aware of the Vault at the time of Plaintiff's requests for production. (Doc. 200 at 43-44). If that is true, which the Court doubts, it demonstrates willful ignorance on Mr. Anderson's part. Mr. Anderson began working for Defendant in 2013 and has been a licensed attorney in Illinois for eleven years. For an experienced company attorney who plays a primary role in responding to discovery requests to claim he just recently became aware of the company's only source of preserved email communications defies common sense. It also represents a disturbing pattern given Mr. Anderson's role on behalf of Defendant in responding to discovery requests. It suggests that Mr.

---

4. Although emails are initially stored on an "exchange server," they are deleted when the exchange server is filled to capacity. (Doc. 201 at 137-141). Employees are therefore directed to clean out their email boxes every three or four months to avoid filling up the exchange server. (*See id.*). Thus, emails pertaining to an insured's claim are likely to be long gone from the exchange server by the time litigation is initiated.

Anderson's typical response to discovery requests for email communications during litigation is to simply, and falsely, assert that a reasonable search was performed and that no such communications, other than what was in the claim file, were found. The Court finds that Mr. Anderson's evasive testimony on this issue lacked credibility.

### b. Frivolous Assertions of Privilege

■ The Court turns next to Defendant's and counsel's assertions of privilege in an attempt to avoid disclosure of documents highly relevant to Plaintiff's bad faith claims. After the Court ordered Defendant to produce an un-redacted version of Ms. Payne's October 16 draft denial letter, it was revealed that at the bottom of the letter she wrote, "Rob I don't want to sign this." (Doc. 150-11 at 8-9). "Rob" was Rob Darner, the claims attorney at the time.[5] As explained above, Defendant and its counsel redacted this statement when the draft letter was disclosed to Plaintiff, the day before Ms. Payne's deposition, claiming that it was protected by the attorney-client privilege and attorney work product. The Court finds, however, that under no reasonable application of the attorney-client privilege or the attorney work product protection is Ms. Payne's statement protected. Defendant's assertion of attorney-client privilege and attorney work product was frivolous.

■ As the Court previously explained in its Order (Doc. 115) regarding the parties' discovery dispute over Defendant's assertions of privilege, the communication must be made to or by the lawyer for the purpose of securing or giving legal advice, must be made in confidence, and must be treated as confidential. *Samaritan Foundation v. Goodfarb*, 176 Ariz. 497, 501, 862

P.2d 870, 874 (Ariz.1993). Similarly, under A.R.S. § 12-2234(B), attorney-client communications are protected from disclosure if the communication is either (1) for the purpose of providing legal advice to the entity or employer or to the employee, agent or member, or (2) for the purpose of obtaining information in order to provide legal advice to the entity or employer or to the employee, agent or member. The privilege "shall not be construed to allow the employee to be relieved of a duty to disclose the facts **solely because they have been communicated to an attorney.**" A.R.S. § 12-2234(C) (emphasis added). With regard to work product, Rule 26(b)(3) provides that documents prepared in anticipation of litigation or for trial are protected as attorney work product.

When questioned at the evidentiary hearing, Mr. Anderson claimed to "have a pretty good working knowledge" of the law on attorney-client privilege. (Doc. 201 at 15). He further claimed, however, that because he does not practice in Arizona, he is "not up to speed on the specifics of Arizona privilege law" and therefore would, in a case like this, rely on the expertise of outside counsel, which in this case are Mr. Burke and Mr. Shaw. (Doc. 201 at 16). Mr. Anderson acknowledged that he was involved, presumably with Mr. Burke and Mr. Shaw, in making the decisions to assert attorney-client privilege over documents in this case. (Doc. 201 at 15).

When Mr. Anderson was questioned specifically about Defendant's assertion of privilege over Ms. Payne's statement at the bottom of the letter, Mr. Anderson demonstrated a fundamental misunderstanding of the scope of attorney-client privilege. He testified that when he saw the statement "Rob I don't want to sign

---

5. Mr. Darner retired in June 2013 at about the time Mr. Anderson started. (Doc. 200 at 43).

this" at the bottom of Ms. Payne's draft letter, he thought that because this was "a communication with in-house counsel, . . . privilege probably applied and so we needed to evaluate that." (Doc. 201 at 24). He further testified that anytime he sees a note like the one Ms. Payne wrote, he "would think there's some expectation that they're asking for some consultation." (Doc. 201 at 25). Thus, under Mr. Anderson's professed understanding of the privilege, anytime a communication involves an in-house attorney, regardless of its content, it is likely privileged and should be interpreted as such. That, however, is not what the law requires.

Despite Mr. Anderson's strained attempts at the evidentiary hearing to claim a reasonable basis for asserting privilege over Ms. Pate's note, the Court has no difficulty concluding that the claim of privilege is frivolous. Mr. Anderson's and counsels' decision to redact Ms. Payne's statement on grounds of attorney-client privilege and attorney work product had no legitimate basis under the law. Even under the most tortured interpretation, Ms. Payne's statement cannot be construed as a request for legal advice. Nor is there any basis to claim it constitutes attorney work product. It is simply an assertion by Ms. Payne that she did not want to sign the draft denial letter—nothing more. Defendant's and counsels' wholly unsupportable assertion, and argument to the Court, that the statement could be withheld under both attorney-client privilege and attorney work product warrants the imposition of sanctions.

 Defendant made similarly unsupported assertions of privilege with respect to the four emails the Court ordered Defendant to disclose. (*See* Doc. 115). Two of the emails were dated October 26, 2012. (Doc. 150-9 at 2-9). The first was from Liz Shepard to Rob Darner, and the second was from Rob Darner to Liz Shepard and

Colleen Payne. (*Id.*). The content of the emails was completely redacted. (*Id.*). The other two emails were dated October 16, 2012. (Doc. 150-9 at 10-13). One was from Ms. Payne to Mr. Darner and the other was from Ms. Payne to Ms. Shepard and Mr. Darner. (*Id.*). Again, the content of both emails was completely redacted. Defendant, through Mr. Burke and Mr. Shaw, argued in their briefing to the Court that all four communications were privileged because they were "communications seeking legal advice regarding policy terms, communications seeking legal compliance review for outgoing correspondence, or both." (Doc. 98 at 4).

Ironically, and as noted above, after the Court rejected Defendant's argument and ordered the disclosure of the emails on January 29, 2016, it became clear that the attachment to the October 16, 2012 email from Ms. Payne to Mr. Darner was in fact the draft denial letter that had been disclosed the day before Ms. Payne's deposition. (Doc. 150-11 at 8-9). Instead of redacting only the last line, as Defendant and counsel did when the letter was first disclosed in September 2015, they redacted the entire letter and spent months asserting to Plaintiff and later arguing to the Court that the entire letter was privileged. The only difference between the letter disclosed in September 2015 was that, according to Defendant, it came directly off of Ms. Payne's computer, while the second letter was attached to an email from Ms. Payne to Mr. Darner that consisted only of the draft denial letters.

It also became clear upon disclosure that two of the other completely redacted emails were unsigned versions of the denial letter Ms. Shepard sent to Plaintiff on October 26, 2012, one with Ms. Shepard's signature block and one with Ms. Payne's. (Doc. 150-11 at 2-7). The letter had already been disclosed as part of the claim file and

Plaintiff himself received the letter when it was mailed to him. The only explanation for why it was later completely redacted is because it was attached to emails involving Mr. Darner as a recipient or sender. There was no other content in the two emails other than the October 26 denial letter.

These three examples of withholding discoverable information that had previously been disclosed clearly demonstrate that rather than evaluate the content of a communication involving a company attorney to determine whether it was privileged, Defendant simply withheld such communications solely because a company attorney was named on the email. That is precisely what Arizona law prohibits. *See* A.R.S. § 12–2234(C) (The privilege "shall not be construed to allow the employee to be relieved of a duty to disclose the facts solely because they have been communicated to an attorney."). The common denominator of the emails was not that they sought or provided legal advice, but rather that they all had in-house counsel as a sender or recipient. (*See* Docs. 150-9 and 150-11). None of the emails contains anything that can be construed as a communication "to or by the lawyer for the purpose of securing or giving legal advice." *See Samaritan Foundation*, 176 Ariz. at 501, 862 P.2d at 874. The mere identification of a lawyer as a recipient or sender of an email, in and of itself, does not cause the content of that email to be privileged.

■■■ With respect to the fourth and final email that was fully redacted, Defendant had no basis to assert attorney-client privilege. The email, a strongly worded explanation by Ms. Payne of her disagreement with the denial of Plaintiff's claim, is not for the purpose of securing legal advice. (Doc. 150-11 at 10). Significantly, Ms. Payne focuses on the medical evidence in the record as the basis for her assertion that the claim should not be denied. Ms. Payne's inquiry at the end of the email

("Do we really want to deny claim?") is clearly not asking for legal advice but is instead asking why, based on the evidence in this case, the claim is being denied. It is not a "communication[ ] seeking legal advice regarding policy terms" or a "communication[ ] seeking legal compliance review for outgoing correspondence," as Defendant's contended in their briefing to the Court. (*See* Doc. 98 at 4). Defendant and counsel had no legitimate basis to withhold this email under attorney-client privilege. For these reasons, the Court finds that, like their assertion of privilege over Ms. Payne's comment on her draft denial letter, Defendant's and counsels' assertions of privilege over the four emails at issue in the Court's prior Order (Doc. 115) were frivolous and warrant the imposition of sanctions.

## B. Credibility of Deposition and Evidentiary Hearing Testimony

### 1. Facts

#### a. Ms. Payne's Deposition

As noted above, Ms. Payne's deposition occurred on September 23, 2015. She testified that she met with Mr. Burke two different times for about an hour and a half each to prepare for her deposition. (Doc. 200 at 5). Mr. Anderson also participated in those meetings. (Doc. 201 at 7). Ms. Payne explained at her deposition that she became involved in Mr. Sell's case in July 2012 when the prior disability analyst, Linda Pate, went on leave. (Doc. 200 at 5-6). She then got up to speed by reviewing the medical records that had been sent in and the other information in the claim file. (Doc. 200 at 6). Ms. Payne stated that after she had reviewed Plaintiff's file and went through the records, date by date, she wrote a claim note to Ms. Shepard in October 2012 stating that based on the records, she believed that pain from his back and neck were keeping Plaintiff off

work. (Doc. 200 at 7, 11; Doc. 150-2 at 4).[6] Ms. Payne also stated in the claim note that while Plaintiff may have some psych problems, they are basically from the pain and self-medication. (*Id.*). She further stated that there was "not enough information to say this is psych," and that in her view "this is medical." (Doc. 200 at 8; Doc. 150-2 at 4).

Ms. Payne further testified in her deposition that later in October 2012, Ms. Shepard sent a letter to Plaintiff telling him his benefits were being terminated. (Doc. 200 at 8). When asked why Ms. Shepard sent the termination letter to Plaintiff in light of the fact that the adjustor typically sends termination letters, Ms. Payne said she did not feel she had enough experience with the file. (Doc. 200 at 9). Ms. Payne said she had a conversation about it with Ms. Shepard and told her that she did not want to send the termination letter. (*Id.*). Ms. Payne also stated, however, that she prepared a draft termination letter. (Doc. 200 at 10). She sent the draft letter to Mr. Darner for review, but the letter was not ultimately sent to Plaintiff. (Doc. 200 at 9-10). Ms. Payne stated that sending her draft to the attorney was part of the claim process and that she did not have a specific question for him. (Doc. 200 at 14). Ms. Payne did not know who made the decision not to send her draft termination letter to Plaintiff and instead use Ms. Shepard's letter. (Doc. 200 at 10).

When questioned more specifically about the sequence of events, Ms. Payne's statements regarding when she changed her mind about whether the claim should be paid were not entirely clear. (Doc. 200 at 15-18). She acknowledged that in the October 10 claims note she told Ms. Shepard she believed the claim should be paid. (Doc. 200 at 15). She said that she subsequently met with Ms. Shepard and reviewed the claim file with her. (Doc. 200 at 16). Ms. Payne claimed that during her meeting with Ms. Shepard she changed her mind and agreed the claim should be terminated. (Doc. 200 at 16-18). She then completed the draft termination letter and sent it to legal. (Doc. 200 at 18). Ms. Payne claimed she wasn't curious, and did not ask, why the termination letter she drafted was not sent. (Doc. 200 at 19). Ms. Payne later identified the letter that was disclosed to Plaintiff the day before her deposition (with the redaction at the bottom) as the draft termination letter she prepared. (Doc. 200 at 20).

Also at her deposition, Ms. Payne testified that she has 30 years of experience as a claims adjustor. (Doc. 200 at 14). When Ms. Payne was asked if she could decline to write the termination letter if she disagreed with a decision to terminate benefits, she stated, "It's never happened before. I do not know." (Doc. 200 at 14-15). She further stated that she has never disagreed with a claim termination before. (Doc. 200 at 15).

### b. Ms. Payne's Evidentiary Hearing Testimony

In addition to her deposition testimony, Ms. Payne appeared for and testified at the evidentiary hearing. She testified that Linda Pate handled Plaintiff's claim from when it was first submitted until she went on disability leave in July 2012. (Doc. 201 at 58-59). When questioned about information placed in the claim file, Ms. Payne testified that she tries to put everything in the claim file, including all emails, but not drafts of letters that have not been approved. (Doc. 201 at 60). She explained that emails are not automatically included in the claim file and have to be imported

---

6. Although Ms. Payne stated that the claim note is from October 2012, the note reflects that she wrote it on September 30, 2012.

(Doc. 150-2 at 4). It appears that Ms. Shepard responded to the claim note on October 10, 2012. (*Id.*).

by the analyst. (Doc. 201 at 61). She admitted that "by an oversight," she did not import into the claim file the October 16, 2012 email from her to Ms. Shepard and Mr. Darner regarding her opposition to the decision to deny Plaintiff's claim. (Doc. 201 at 63-64).

As in her deposition, Ms. Payne stated in her evidentiary hearing testimony that she changed her mind about whether Plaintiff's claim should be paid when she met with Ms. Shepard. (Doc. 201 at 66). She claimed that Ms. Shepard "pointed out numerous things that—would not make him have a viable disability based on a physical condition." (Doc. 201 at 66-67). Regarding the draft termination letter she prepared, Ms. Payne claimed that she wrote "Rob I don't want to sign this" at the bottom because Ms. Shepard had more experience with this claim and that she (Ms. Payne) had just gotten involved in July. (Doc. 201 at 67). Ms. Payne also stated one additional reason for writing the note at the bottom, a reason she did not provide during her deposition. (Doc. 201 at 68). She now claims that this case was an appeal and that appeal letters are supposed to come from management. (Id.). Ms. Payne testified that even though she didn't think she should be sending the termination letter, she agreed with the content of her draft. (Id.).

On cross-examination at the evidentiary hearing, Ms. Payne acknowledged that despite her prior testimony, she had involvement in Plaintiff's claim before July 2012, including requesting medical records in 2011 and sending a letter to Plaintiff in 2011. (Doc. 201 at 69-70). She also sent a medical review form to the nurse consultant, Pam Newby, in February 2012, in which she described Plaintiff and his work-related impairments. (Doc. 201 at 70). After getting a response from Ms. Newby, Ms. Payne sent a memo to her supervisor discussing that Plaintiff's back condition was keeping him from working. (Doc. 201 at 71). Ms. Payne claimed these instances show only that she "had knowledge of the claim" but not that she "was involved in the claim." (Doc. 201 at 71-72).

Ms. Payne testified that when she took over the claim from Linda Pate in July 2012, she had to reacquaint herself with the file and review all the medical records to see what had happened. (Doc. 201 at 72). By October 2012 she had gone through the claim file and looked at the medical records. (Id.). She also had telephone conversations with Plaintiff. (Doc. 201 at 80). Thus, she was familiar with the file, and knew that four different physicians believed Plaintiff was suffering from severe back pain, when she wrote the memo to Ms. Shepard in October 2012 that in her view this was a medical disability case, not psychological. (Doc. 201 at 73; Doc. 150-2 at 4). Based on the medical information in the file, Ms. Payne concluded at that time that the pain from Plaintiff's back and neck were keeping him off work. (Doc. 201 at 74). She did not believe it was a psychological disability claim, stating they "had no proof of that." (Doc. 201 at 74). When asked at the evidentiary hearing, however, whether she still believed this was not a psych claim, Ms. Payne said she had changed her mind. (Doc. 201 at 74-75). She conceded that at her deposition she testified that she never believed this was a psychological claim. (Doc. 201 at 75). But since her deposition in September 2015, she changed her mind. (Id.). She said she went over the claim several times since her deposition and could now see how it could be considered a psychological claim. (Doc. 201 at 76).

In response to Ms. Payne's October 2012 memo to Ms. Shepard, Ms. Shepard directed Ms. Payne to give the file to Pam Newby to review new medical information that had come in since Ms. Newby's last

review, which Ms. Payne did. (Doc. 201 at 76; Doc. 150-2 at 4). Ms. Newby's response on October 10, 2012 did nothing to change Ms. Payne's opinion that this was a payable claim. (Doc. 201 at 77).

Ms. Payne acknowledged that she sent an email to Ms. Shepard, Ms. Newby and Mr. Darner setting a meeting regarding Plaintiff's claim on October 15, 2012. (Doc. 201 at 78; Doc. 150-9 at 14). Ms. Payne claimed, however, that she does not recall having this meeting. (Doc. 201 at 78-79). Rather, she believes she had a meeting with Ms. Shepard on October 16, during which Ms. Payne changed her mind and agreed that Plaintiff's claim should be terminated. (Doc. 201 at 79).

Ms. Payne also answered questions about her strongly worded email to Liz Shepard and Rob Darner on October 16, referenced above on page 14, in which she expressed her concern over this claim and her disagreement with the "determination to cut him off." (Doc. 201 at 79-83; Doc. 150-11). Because, as previously discussed, this email was not disclosed until after Ms. Payne's deposition, questions about the email were not part of her deposition. Ms. Payne testified that she wrote the email before her meeting that same day with Ms. Shepard. (Doc. 201 at 79). She claimed that nothing happened that prompted her to write the email and that she had the concerns expressed in the email throughout the time she was involved in the case. (Doc. 201 at 79-80, 82). Ms. Payne agreed that she had strong feelings about this case (in favor of paying Plaintiff's physical disability claim) all the way up to October 16, including when she wrote the strongly—worded email that morning. (Doc. 201 at 83). But then when she met later that day with Ms. Shepard, she changed her mind. (*Id.*).

After her meeting with Ms. Shepard, Ms. Payne testified that she wrote the draft termination letter with the phrase,

"Rob I don't want to sign this" at the bottom. (Doc. 201 at 83-83). She agreed that Ms. Shepard asked her to write the letter. (Doc. 201 at 85). She further agreed that Ms. Shepard would only ask her to write a termination letter, not an appeal letter. (Doc. 21 at 85-86).

### c. Ms. Shepard's Deposition

Ms. Shepard's deposition took place on September 25, 2015. She explained that she is the supervisor of life, disability, and long-term care claims for Defendant. (Doc. 200 at 20). She testified that before she reviewed the file for three or four hours a couple weeks prior to her deposition, she did not remember Plaintiff's claim. (Doc. 200 at 20-21). In addition to her own review, Ms. Shepard met with Mr. Burke and Mr. Anderson for a couple hours about a month before her deposition to discuss the case. (Doc. 200 at 21).

Ms. Shepard testified that she wrote the October 26, 2012 termination letter that was sent to Plaintiff. (Doc. 200 at 21-22). Ms. Shepard further testified that she had no recollection of talking to Ms. Payne about the case and asking her to draft the termination letter. (Doc. 200 at 24-25). She also testified that she had no memory of ever seeing Ms. Payne's draft termination letter before it was presented to her at the deposition. (Doc. 200 at 25). Despite acknowledging that no other person would have asked Ms. Payne to write the draft termination letter, Ms. Shepard would not concede that she apparently asked Ms. Payne to draft it. (Doc. 200 at 26).

### 2. Discussion

### a. Ms. Payne's Credibility

As revealed by Plaintiff's counsel's effective cross-examination of Ms. Payne at the evidentiary hearing, several aspects of Ms. Payne's deposition and evidentiary hearing testimony lack credibility. During her evidentiary hearing testimony, Ms.

Payne tried to minimize her involvement in Plaintiff's disability claim, maintaining she was not involved until Linda Pate went on disability leave in July 2012. As revealed on cross-examination, however, she worked on Plaintiff's claim in December 2011 and again in early 2012 before taking over completely for Linda Pate in July 2012. Ms. Payne dismissed her work on the case before July 2012, claiming it "doesn't really necessarily mean that I was involved in the claim." (Doc. 201 at 71). Ms. Payne's effort to minimize her involvement in Plaintiff's case is important because it sets the stage for her later assertion that she did not want to sign her draft termination letter because she felt she did not have enough experience with this case, an assertion that lacks credibility.

At the time of Ms. Payne's deposition in September 2015, Plaintiff did not have the un-redacted version of Ms. Payne's draft termination letter or the strongly-worded email she wrote to Ms. Shepard and Mr. Darner on October 16, 2012 stating her disagreement with the decision to cut off Plaintiff's benefits. Once those documents were disclosed, however, the lack of credibility in her deposition testimony became clear.

There is no question in the Court's mind that Ms. Payne's assertion at the bottom of her draft termination letter, "Rob I don't want to sign this," was another expression of her strong and consistent disagreement with the decision to terminate Plaintiff's benefits. Ms. Payne, however, with the assistance of defense counsel, would have the Court believe that despite her firm opinion throughout the claim process that the claim was payable, her note to Mr. Darner at the bottom of the draft termination letter had nothing to do with her opinion about the claim. Instead, if the Court is to believe Ms. Payne, the statement simply reflected her stated view that she did not have enough experience on this case. And

as we learned for the first time at the evidentiary hearing, she now claims she did not want to sign the letter because it involved an appeal. The Court does not find Ms. Payne's testimony credible and finds that her purported reasons for her note to Mr. Darner were conceived after the fact to support a false narrative.

With regard to her purported insufficient familiarity and experience with the case, Ms. Payne, a senior claims analyst with 30 years of experience, expressed no such concern in her October 10 claim note or her October 16 email. In the claim note, she made her opinion very clear that Plaintiff's claim was medical, not psychological, and that he needed to be paid. Likewise, the emphatic language of her October 16 email to Ms. Shepard and Mr. Darner certainly was not what one would expect from someone who believed she was not sufficiently familiar with the case to sign the termination letter. Ms. Payne's testimony that a lack of experience on the case was her reason for saying she did not want to sign the termination letter is simply not credible.

Nor is her sudden realization that she now views this as an appeal, credible. In her email of October 16, Ms. Payne described the company's actions against Plaintiff as a denial of a claim and, despite her disagreement with the denial, said she would draft a denial letter. She said nothing about it being an appeal and expressed no reservation about drafting the letter. Similarly, as noted above, on cross-examination at the evidentiary hearing, she admitted that Ms. Shepard told her to write the claim termination letter and that Ms. Shepard would not ask her to prepare an appeal letter because analysts do not write appeal denial letters. Moreover, the note to Mr. Darner on the draft termination letter made no mention of an appeal as the basis for not wanting to sign the letter. If that

had truly been the basis for her note, Ms. Payne would not even have drafted the letter. Her testimony was clear that analysts do not prepare appeal denial letters; supervisors prepare them. The Court therefore has no difficulty concluding that Ms. Payne, through counsel, came up with these new and after-the-fact explanations for why she said she did not want to sign the termination letter. As is typically the case, the true reason she wrote that note is the most logical reason: Ms. Payne did not want to sign the letter because she did not agree with the decision to terminate. Plaintiff's benefits. The evidence definitively points to that conclusion. Her testimony that she changed her mind about this claim at the last minute is simply not believable in light of the other evidence.

The Court recognizes that insurance adjustors in the course of working on a claim file certainly can change their minds about whether a disability claim should be paid, which Ms. Payne claims she did after meeting with Ms. Shepard on October 16. As discussed, however, clear evidence exists here that shows Ms. Payne did not change her mind about this claim. Instead of testifying in her deposition or at the evidentiary hearing that she maintained her disagreement with the decision to terminate Plaintiff's benefits, which arguably would have bolstered Plaintiff's bad faith claim, Ms. Payne and her lawyers embarked on a path of misleading and deceiving testimony and arguments to Plaintiff and this Court.

Part of that deceit involved the frivolous assertions of privilege to prevent Plaintiff from ever learning what Ms. Payne wrote at the bottom of the letter and the content of the other emails they sought to withhold. The lengths to which defense counsel went to avoid disclosing that statement and the other emails also support the Court's finding that Ms. Payne did not change her mind and that she maintained her disagreement with the termination of Plaintiff's claim.

Other aspects of Ms. Payne's testimony also reflect an effort to deceive and mislead Plaintiff and the Court. For example, as referenced above, when asked at her deposition whether she could decline to write a termination letter if she disagreed with a decision to terminate benefits, she said she did not know because she has never disagreed with a claim termination. But the October 16 email (disclosed after her deposition) and her evidentiary hearing testimony demonstrated that her deposition testimony on this issue was false. In the October 16 email, Ms. Payne expressed her strong disagreement with the claim denial. Despite that disagreement, she offered to write the denial letter. Thus, the scenario that she testified had never happened before did in fact happen in this case. At the time she said she would write the termination letter, she strongly disagreed with the decision to deny the claim. Ms. Payne essentially conceded at the evidentiary hearing that her deposition testimony on this issue was not truthful:

Q. And is it a fair statement to say that you were going to write a termination letter that you didn't agree should be sent, because you didn't think the claim should be terminated at that point?

A. Correct.

Q. Now, you were asked, if you recall, in your deposition, what would happen if you were ever asked to write a termination letter, and if you didn't agree with the termination, can you decline it, and you said, "That has never happened"? Do you recall that?

A. Yes, I do.

Q. And you said you've also never disagreed with a claim termination before, correct?

A. Correct.

Q. But here you were willing to write a termination letter that you did disagree with, correct?

A. Correct.

(Doc. 201 at 101).

As the above discussion demonstrates, several parts of Ms. Payne's deposition and evidentiary hearing testimony are not credible. There appears to have been a concerted effort by Ms. Payne and counsel to mislead Plaintiff and the Court into believing that, after one meeting with Ms. Shepard, she completely reversed her long-lasting and firmly held belief that this was a payable medical claim. That strategy included withholding Ms. Payne's statement at the bottom of her draft termination letter, the October 16 email showing her strong disagreement with denying the claim, and the other emails with termination letters attached. Once these withheld documents were revealed, it became clear that Ms. Payne did not change her view of the claim. Unfortunately, she and counsel stuck to their story despite clear evidence showing it to be false. Ms. Payne's untruthful deposition and evidentiary hearing testimony, with counsels' assistance, warrants the imposition of sanctions.

### b. Ms. Shepard's Credibility

Similarly, the Court finds that key aspects of Ms. Shepard's deposition testimony lack credibility. Ms. Shepard professed to have no recollection of meeting with Ms. Payne about this case, a meeting that according to Ms. Payne was the determining factor in changing her mind about whether the claim should be paid. Ms. Shepard further claims to have no memory of ever telling Ms. Payne to draft the termination letter, insisting that she fully intended to write the termination letter all along, and did write the letter.

The Court finds it difficult to accept that, after spending "three or four hours" reviewing Plaintiff's claim, and another "couple hours" discussing the claim with Mr. Burke and Mr. Anderson, both shortly before her deposition, she had no memory of ever talking to Ms. Payne about Plaintiff's claim. Even though any conversations would have occurred approximately three years earlier, the unique circumstances of this claim suggest they would not be easily forgotten. This case involved a highly experienced senior claims analyst who voiced strong disagreement with the decisions to stop Plaintiff's benefits after only a couple months, to construe the claim as psychological rather than medical, and to ultimately to deny benefits altogether and terminate the claim. Ms. Payne's disagreements were to the point that she refused to sign the termination letter. Against this backdrop, it is difficult to see how Ms. Shepard can claim to have no recollection of any conversation with Ms. Payne about the case.

Moreover, the record does not support Ms. Shepard's assertion that she intended to, and did, write the termination letter to Plaintiff. After Ms. Payne prepared her draft termination letter, which she said she did at Ms. Shepard's direction, Ms. Payne sent it to Rob Darner. (Doc. 150-9 at 10-12). Ten days later, Mr. Darner sent a new version of the termination letter to Ms. Shepard and Ms. Payne with Ms. Payne's signature block at the bottom. (Doc. 150-9 at 6-9; Doc. 150-11 at 5-7). Minutes later, Ms. Shepard sent the exact same letter back to Mr. Darner but substituted her signature block in place of Ms. Payne's. (Doc. 150-9 at 2-5; Doc. 150-11 at 2-4). That letter, with Ms. Shepard's signature, was then sent to Plaintiff. It is clear that Ms. Shepard simply substituted her signature block on a letter that Mr. Darner had written after receiving an initial draft from Ms. Payne.

The Court sees little evidence supporting Ms. Shepard's testimony that she fully

intended to, and did, write the termination letter to Plaintiff. By testifying this way, Ms. Shepard furthered the false narrative that the absence of Ms. Payne's signature on the letter was not indicative of her disagreement with the claim termination. Rather, under Defendant's fabricated scenario, Ms. Payne fully agreed with the decision but declined to sign the letter for other reasons, as previously discussed.

As cited by Plaintiff, "The claim, 'I don't remember,' can be a lie if the speaker does remember, and even though no one can see another's memory, the falsity is subject to proof by circumstantial evidence, admissions, and other evidence." *Valley Engineers Inc. v. Electric Engineering Co.*, 158 F.3d 1051, 1055 (9th Cir.1998). Under the circumstances here, the Court finds that Ms. Shepard's testimony was not credible.

## C. Defendant's Systemic Deficiencies Regarding Discovery Obligations

Although not directly argued by Plaintiff, the testimony at the evidentiary hearing revealed some alarming deficiencies in how Defendant preserves information that may later be subject to disclosure in a lawsuit. The testimony revealed that emails between the relevant employees involved in a particular claim are preserved only from the date that Defendant is served with a lawsuit and a "litigation hold" is put in place. Thus, the emails produced around the time a decision on a claim is being made, which is likely the most relevant time in a lawsuit alleging improper denial of a claim, are typically not preserved in the Vault.[7] Instead, it is up to the discretion of a claims analyst and other employees involved in a claimant's file to preserve their emails pertaining to a claim by electronically depositing their communications into the claim file (or "AWD" as it was referred to at the hearing). As has been demonstrated in this case, however, email communications that are highly relevant to Plaintiff's claim, and which are subject to disclosure, never made it to the claim file because nobody working on Plaintiff's claim put them there.

Although the four emails discussed above were recovered pursuant to a search of the Vault, their recovery apparently was not pursuant to the litigation hold put in place for this case because they pre-dated, by more than two years, the start of the litigation hold. Presumably, these emails were preserved only because one (or more) of the employees subject to the litigation hold pertaining to Plaintiff's case was also subject to a prior hold. Only that would explain why emails relevant to Plaintiff's claim from October 2012, were preserved in the Vault. The question becomes what happened to other discoverable emails between employees who may have been involved with Plaintiff's claim in 2011 and 2012 but were not the subject of a prior litigation hold and who did not place their emails in the claim file. According to the testimony from Mr. Bee, the answer is pretty clear: such emails were not preserved.

The testimony also demonstrated that the "exchange server," where emails are initially stored, is of little value for litigation purposes. As noted above, emails in the exchange server are deleted when the server is filled to capacity. Thus, employees typically clean out their email boxes every three or four months to avoid filling up the exchange server.

Consequently, under Defendant's system, email communications that occur at

---

7. An exception is when a relevant employee's emails were already under a litigation hold from another case. When a litigation hold is imposed, all of the relevant employees' emails are preserved in the Vault until the litigation hold is ended.

arguably the most relevant time in a case challenging a claim denial or some other action by Defendant are not preserved, unless employees electronically deposit their communications into the appropriate claim file. The Court suspects the system was not set up this way by happenstance. The Court is unaware of whether other insurance companies, or any company for that matter, have similarly unreliable mechanisms in place for the long-term preservation of emails. Regardless, the Court finds that Defendant's system is deficient in that it fails to preserve substantial quantities of relevant and discoverable communications regarding the handling of claims. Moreover, the system creates incentives to exclude from the claim file any email communications that could potentially harm Defendant's position in subsequent litigation, knowing that such emails are unlikely to be preserved in the Vault. Thus, Defendant's email preservation system, which appears designed to avoid disclosure of discoverable information, strengthens the Court's view that sanctions are warranted here.

## D. Appropriate Sanction

██ Plaintiff has presented substantial and compelling evidence that demonstrates serious misconduct by Defendant and its counsel in this case. Testimony from the evidentiary hearing, deposition testimony, and documentary evidence, as described above, combine to show a concerted effort to wrongfully withhold evidence, misrepresent the facts, and mislead Plaintiff and the Court to comport with Defendant's and counsels' false narrative. Defendant and its counsel withheld relevant and discoverable evidence by essentially ignoring requests for production of documents and then by frivolously asserting the documents were privileged. They misrepresented the facts surrounding their conduct during discovery by asserting they had conducted reasonable searches in response to Plaintiff's

requests when they had not. They misrepresented the facts of the case by redacting highly relevant information and making false assertions of privilege. They then presented false deposition and hearing testimony to align with their fabricated account of what occurred. By doing so, Defendant and counsel sought to prevent Plaintiff and the Court from learning the truth about the circumstances surrounding the termination of Plaintiff's disability claim, thereby misleading Plaintiff and the Court into accepting their narrative. The Court finds that the evidence amply demonstrates that Defendant's and counsels' misconduct was willful and done in bad faith. *See Leon*, 464 F.3d at 958 (holding that the district court must make a finding of "willfulness fault or bad faith" for dismissal or default to be proper).

. . . .

. . . .

. . . .

. . . .

. . . .

The Court further finds that a strong relationship exists here between Defendant's and counsels' misconduct and the matters in controversy. *See Anheuser–Busch*, 69 F.3d at 348 (holding that "[d]ue process concerns further require that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression threaten[s] to interfere with the rightful decision of the case.") (internal quotations and citations omitted). Defendant's and counsels' misconduct in this case goes directly to the heart of Plaintiff's claims of whether Defendant breached the terms of the disability insurance contract and breached its duty of good faith and fair dealing in its handling of his claim. Had Defendant not been required to disclose the redacted portions of the emails

and letters, the evidence would reflect only that Ms. Payne, Plaintiff's claim adjustor with thirty years of experience, agreed with the termination of Plaintiff's physical disability claim. As the evidence now shows, that is simply not the case. Under these circumstances, it is difficult for this Court to see how Defendant's conduct merits anything less than the imposition of severe sanctions.

For the foregoing reasons, the Court finds that Defendant's and counsels' misconduct, committed in bad faith for the purpose of deceiving and misleading Plaintiff and the Court, warrants the striking of Defendant's Answer (Doc. 7) and the entering a default judgment on Plaintiff's claims. As the above discussion of these issues demonstrates, the Court does not take lightly its obligation to exercise restraint and discretion before imposing a sanction of this severity. However, given the nature of the misconduct, and the fact that it was an organized effort among multiple participants to deceive, the Court concludes that this severe sanction is called for here.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Sanctions (Doc. 150) is **GRANTED.**

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to **STRIKE** Defendant's Answer (Doc. 7) and enter default against Defendant pursuant to Rule 55(a) of the Federal Rules of Civil Procedure.

**IT IS FINALLY ORDERED** that the Court will, by separate order, set a final pretrial conference and provide further instructions to the parties regarding a trial on damages pursuant to Rule 55(b)(2).